**SAGEBRUSH REBELLION, INC.,**
Plaintiffs-Appellants,

v.

Donald P. HODEL,* Secretary of the Interior; Robert Burford, Director of the Bureau of Land Management, United States Department of the Interior; and the United States of America, Defendants-Appellees,

and

National Audubon Society, et al.,
Intervenors-Appellees.

No. 84–4371.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 7, 1985.

Decided May 28, 1986.

R. Norman Cramer, Constance E. Brooks, Mountain States Legal Foundation, Denver, Colo., for plaintiffs-appellants.

John J. Rademacher, Richard L. Drause, Park Ridge, Ill., for amicus American Farm Bureau Federation.

Scot W. Reed, Coeur d'Alene, Idaho, for Intervenor.

Larry Martin Corcoran, Jacques B. Gelin, Robert L. Klarquist, Dept. of Justice, Appellate Section, Land & Natural Resources Div., Washington, D.C., for defendants-appellees.

Before WRIGHT, REINHARDT, Circuit Judges, and SOLOMON,** District Judge

REINHARDT, Circuit Judge:

Plaintiffs Sagebrush Rebellion, Inc., a non-profit organization dedicated to the multiple-use management of the public lands, and several groups and individuals interested in the private agricultural development of public lands (hereinafter collectively referred to as "Sagebrush") challenge the Secretary of the Interior's withdrawal[1] of the Snake River Birds of Prey National Conservation Area in southern Idaho, for alleged failure to comply with the notice and hearing requirements of the Federal Land Policy and Management Act of 1976 (FLPMA), 43 U.S.C. §§ 1701–82 (1982). The district court upheld the Secretary's action. We affirm.[2]

---

** The Honorable Gus J. Solomon, Senior United States District Judge, District of Oregon, sitting by designation.

1. A withdrawal withholds an area of federal land from sale, lease or use under the general land laws (which authorize and regulate the transfer of federal lands to the private domain) in order to preserve a public value in the area or for a public purpose. *Cf.* 43 U.S.C. § 1702(j) (1982).

2. The following abbreviations appear in the opinion:

FLPMA = Federal Land Policy and Management Act of 1976
NEPA = National Environmental Policy Act of 1969
EIS = Environmental Impact Statement
DEIS = Draft Environmental Impact Statement
BLM = Bureau of Land Management

## I. BACKGROUND

### A. Creation of the Birds of Prey Conservation Area

The Snake River Canyon in southwestern Idaho provides a habitat for the densest known population in northern America of eagles, hawks, falcons, owls and other birds of prey. Since 1968, the Bureau of Land Management (BLM) has sought to protect that habitat from destruction by agricultural development. The Secretary of the Interior created the 26,000 acre Snake River Birds of Prey Natural Area in 1971. When it became apparent that the birds' habitat extended far beyond the Natural Area, the BLM established a 484,000 acre study area and imposed a moratorium on the disposal under the Carey and Desert Land Acts of federal lands within that area.[3] In 1977, Secretary of the Interior Cecil B. Andrus nearly doubled the study area, and extended the moratorium to 539,-000 acres. Finally, in 1979, Secretary Andrus proposed legislation to establish the Snake River Birds of Prey National Conservation Area (Conservation Area),[4] by permanently withdrawing the area from the operation of the public land and mining laws.

The Secretary prepared a Draft Environmental Impact Statement (DEIS) on the proposed legislation and published notices of its availability, pursuant to the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. §§ 4321–47 (1982). 44 Fed.Reg. 39313–14 (July 5, 1979); 44 Fed.Reg. 40129 (July 9, 1979). The notices specified the affected lands, summarized the purpose, and the legal consequences of the withdrawal, and announced upcoming hearings on the DEIS.[5]

The DEIS analyzed the environmental and socio-economic impacts of congressional withdrawal of the Conservation Area, and of three alternative actions. One of the alternatives analyzed was administrative withdrawal of the Conservation Area by the Secretary under section 204 of FLPMA, 43 U.S.C. § 1714. The DEIS stated that the impact of administrative withdrawal would be identical to that of congressional withdrawal, since withdrawal of the Conservation Area by either branch of government would have the identical legal effect, with only one exception: whereas the congressional withdrawal would be in perpetuity (subject, of course, to Congress' inherent right to enact legislation to the contrary in the future), FLPMA limits administrative withdrawals to a maximum of twenty years, and makes them subject to congressional review and administrative revocation. See 43 U.S.C. § 1714(a), (c), (f). The protection provided the Conservation

---

FWCA = Fish and Wildlife Coordination Act of 1958
ICA = Interstate Commerce Act.

3. The Carey Act, enacted in 1894, authorizes the Secretary of the Interior to cede to the states free of cost federal desert lands for irrigation and development. 43 U.S.C. §§ 641–47 (1982). The Desert Land Act, enacted in 1877, allows individuals to purchase federal desert lands for reclamation for a nominal fee. 43 U.S.C. §§ 321–29 (1982).

4. The legislation was proposed as an amendment to Title VI of FLPMA.

5. The July 5, 1979 notice reads in relevant part:
    The statement addresses protection and management of raptors along an 81-mile stretch of the Snake River in southwestern Idaho, which provides nesting habitat for more than 1,000 birds of prey each year. This area constitutes the densest nesting popula-

tion of raptors in the world, and is an area of both national and international significance. The proposed action includes: designation, by Congress, of 515,257 acres of public land in Ada, Canyon, Elmore, and Owyhee Counties, Idaho, as the Snake River Birds of Prey National Conservation Area; exploration and extraction of minerals governed by the 1872 Mining Law only under a leasing procedure, except for valid existing rights; removal of the lands involved from application under the Desert Land, Carey, and State of Idaho Admissions Acts; mineral leasing under the Mineral Leasing or Geothermal Steam Acts only as provided in a land-use plan developed under the authority of the Federal Land Policy and Management Act of 1976; and continuation of National Guard use of a portion of the area. Management of the area would be continued under the existing management plan which would be revised or updated as new data warrants.
44 Fed.Reg. 39313–14.

Area by administrative withdrawal, therefore, would be somewhat more tenuous than if Congress withdrew the lands. The DEIS did not specify the duration of an administrative withdrawal. Because a congressional withdrawal is permanent, the DEIS advocated that form of action rather than an administrative withdrawal.

Over sixty people testified at the hearings and over three hundred people submitted written comments. The vast majority of commentators addressed the question whether, rather than by what mechanism, to create the Conservation Area. Several of the commentators, however, did distinguish between congressional and administrative withdrawal, and a few advocated the latter action.

In April 1980, Secretary Andrus submitted to Congress a proposed bill to withdraw the Conservation Area, accompanied by a final environmental impact statement (noticed in 45 Fed.Reg. 10046 (Feb. 14, 1980)). Congress never acted on the bill. In November, after President Carter had failed to win re-election, Secretary Andrus exercised his administrative powers under section 204 of FLPMA to withdraw the Conservation Area for a period of twenty years. Public Land Order 5777, 45 Fed. Reg. 78688 (Nov. 26, 1980).[6] The Secretary simultaneously submitted a report on the withdrawal to Congress, pursuant to section 204(c) of FLPMA, 43 U.S.C. § 1714(c). Although section 204(c)(1) establishes a mechanism for a bicameral veto of an administrative withdrawal, Congress took no action under that section.

### B. Procedural History

Plaintiffs initially filed suit in April, 1980 to compel the Secretary of the Interior to withdraw his proposal for *legislative* enactment of a Conservation Area on the ground that the accompanying environmental impact statement did not comply with NEPA. When Secretary Andrus subsequently withdrew the lands by *administrative* action, Sagebrush amended its complaint to challenge that action as well; the challenge to the administrative withdrawal was based on the Secretary's alleged failure to follow the notice and hearing procedures of FLPMA, 43 U.S.C. § 1714(b), (h). Sagebrush and the government filed cross-motions for partial summary judgment on the question of the Secretary's compliance with FLPMA. The National Audubon Society and several other groups and individuals with environmental and conservation interests moved to intervene on the side of the government. On appeal, we ordered that their motion be granted. *Sagebrush Rebellion, Inc. v. Watt,* 713 F.2d 525 (9th Cir. 1983). The intervenors then filed their own cross-motion for partial summary judgment. The district court granted the government's and the intervenors' motions and denied Sagebrush's motion, holding that FLPMA's notice and hearing requirements were satisfied by the notice given and hearings held in connection with the legislative proposal to create the Conservation Area, and that, in the alternative, any failure by the Secretary to comply fully with the FLPMA requirements constituted harmless error. The district court then dismissed Sagebrush's NEPA claims pursuant to the stipulation of the parties. Sagebrush appeals on the FLPMA issue only.

### II. *STANDARD OF REVIEW*

We review *de novo* the district court's entry of summary judgment. *Lojek v. Thomas,* 716 F.2d 675, 677 (9th Cir.1983). We may set aside the Secretary's action only if it was "arbitrary, capricious, an abuse of discretion, or ... without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D) (1982); *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416–17, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136 (1971). The Secretary's con-

---

**6.** Specifically, 417,775 acres of federal land in Ada, Canyon, Elmore and Owyhee counties of Idaho were withdrawn from entry, application, or selection under the Desert Land Act, the Carey Act, the State of Idaho Admissions Act, 26 Stat. 215, and the Schools Lands Selection statutes, 43 U.S.C. §§ 851–52 (1982). An additional 64,865 acres were withdrawn from location or entry under the Mining Law of 1872, as amended, 30 U.S.C. §§ 21–54 (1982).

struction of FLPMA is entitled to considerable deference. *See Walker v. Navajo-Hopi Indian Relocation Commission,* 728 F.2d 1276, 1278 (9th Cir.), *cert. denied,* — U.S. ——, 105 S.Ct. 298, 83 L.Ed.2d 233 (1984). In evaluating whether to set aside the Secretary's action, we take due account of the rule of prejudicial error. 5 U.S.C. § 706 (1982); *County of Del Norte v. United States,* 732 F.2d 1462, 1467 (9th Cir. 1984), *cert. denied,* — U.S. ——, 105 S.Ct. 958, 83 L.Ed.2d 964 (1985); *Buschmann v. Schweiker,* 676 F.2d 352, 358 (9th Cir.1982).

## III. *ISSUE ON APPEAL*

■ Section 204(b) of FLPMA requires that the Secretary publish notice of a proposed withdrawal, which publication has the effect of temporarily segregating the lands.[7] Section 204(h) requires that the Secretary hold a hearing on all new withdrawals.[8] Sagebrush argues that the Secretary failed to provide notice of and hold hearings on the administrative withdrawal of the Conservation Area because the NEPA notice and hearings were conducted pursuant to a different statute and were allegedly directed at an allegedly different proposal than administrative withdrawal. Consequently, Sagebrush urges, the Secretary should have held a set of "FLPMA" hearings on the administrative withdrawal of the lands in addition to the previously conducted set of NEPA hearings. Sagebrush considers irrelevant to the Secretary's obligations under FLPMA the facts that (1) the administrative withdrawal of the Conservation Area was identical to congressional withdrawal (with the exception of duration and administrative revocability), and (2) administrative withdrawal of the Conservation Area was under consideration as an alternative to legislative withdrawal in the NEPA hearings. On this appeal we must decide whether FLPMA requires a second notice and hearing on an administrative withdrawal subsequent to a properly noticed and conducted NEPA hearing on a DEIS which analyzed administrative withdrawal as an alternative to a proposed congressional withdrawal of lands involved.

### A. Adequacy of Notice

■ Sagebrush argues that the notices of the DEIS and the hearings did not satisfy FLPMA's notice requirement because they did not state that the Secretary, rather than Congress, might create the Conservation Area, nor that the lands would be segregated pending consideration of the withdrawal proposal.

We agree that the notices did not comply in every respect with the terms of section 204(b). However, we find the error to be harmless since the purposes of FLPMA's notice requirement were fully satisfied. *See Small Refiner Lead Phase-Down Task*

---

**7.** Section 204(b)(1) reads in full:

Within thirty days of receipt of an application for withdrawal, and whenever he proposes a withdrawal on his own motion, the Secretary shall publish a notice in the Federal Register stating that the application has been submitted for filing or the proposal has been made and the extent to which the land is to be segregated while the application is being considered by the Secretary. Upon publication of such notice the land shall be segregated from the operation of the public land laws to the extent specified in the notice. The segregative effect of the application shall terminate upon (a) rejection of the application by the Secretary, (b) withdrawal of lands by the Secretary, or (c) the expiration of two years from the date of the notice.

43 U.S.C. § 1714(b). "Segregation" is the temporary withdrawal of public lands from the operation of the public land laws. 43 C.F.R.

§ 2300.0–5(m) (1985). When the Conservation Area was withdrawn, the BLM had not yet revised its withdrawal regulations to conform to FLPMA. The 1979 regulations did not require publication of notice of segregation in order for such segregation to be effective. 43 C.F.R. § 2091.2–5(a) (1979). The 1979 regulations did require the publication of notice of receipt of an application for withdrawal and of the opportunity for public comment sufficient to inform the interested public of the proposed withdrawal. 43 C.F.R. § 2351.4 (1979).

**8.** Section 204(h) reads:

All new withdrawals made by the Secretary under this section (except an emergency withdrawal made under subsection (e) of this section) shall be promulgated after an opportunity for a public hearing.

43 U.S.C. § 1714(h).

*Force v. United States Environmental Protection Agency,* 705 F.2d 506, 549 (D.C. Cir.1983) ("even if the agency has not given notice in the statutorily prescribed fashion, actual notice will render the error harmless."); *County of Del Norte,* 732 F.2d at 1467 ("insubstantial errors in an administrative proceeding that prejudice no one do not require administrative decisions to be set aside."). An agency may rely on harmless error only when its " 'mistake ... is one that clearly had no bearing on the procedure used or the substance of decision reached.' " *Buschmann,* 676 F.2d at 358 (quoting *Braniff Airways v. C.A.B.,* 379 F.2d 453, 461 (D.C.Cir.1967)).

The purpose of a section 204(b) notice is to notify the public of a possible administrative withdrawal and of the opportunity to be heard on that withdrawal. In evaluating whether the notices were adequate under FLPMA for that purpose, we draw upon the standard for sufficiency of a notice of rule-making under the Administrative Procedures Act, 5 U.S.C. § 553(b)(3) (1982), even though a withdrawal is not an act of rule-making.[9] A notice of a rule-making is sufficient if it "provides a description of the subjects and issues involved." *California Citizens Band Association v. United States,* 375 F.2d 43, 49 (9th Cir.), *cert. denied,* 389 U.S. 844, 88 S.Ct. 96, 19 L.Ed.2d 112 (1967). We find that the notices described the subjects and issues involved in the Conservation Area withdrawal by identifying the affected lands and the legal consequences of the withdrawal. We do not believe that the failure to state in the notice that the lands might, in the alternative, be withdrawn by administrative action prejudiced the public's ability to participate in the decision-making process. The same public that would comment on a proposed administrative withdrawal would in all likelihood comment on a congressional withdrawal, since the impact of both actions on all concerned persons would be identical for a substantial period of time at least.[10] Because the same public would have responded to a notice of administrative withdrawal as responded to the noticed congressional withdrawal, and because, as we conclude below, the hearings provided the public with the opportunity to comment on an administrative as well as a legislative withdrawal of the Conservation Area, we conclude that the "procedures used [and] the substance of decision reached," *Buschmann,* 676 F.2d at 358, by the Secretary were unaffected by the technical deficiency of notice.

We find inapposite the cases cited by Sagebrush to invalidate the withdrawal under section 204(b), for they involved agency action preceded by either clearly inadequate or nonexistent notice. In *National Tour Brokers Association v. United States,* 591 F.2d 896 (D.C.Cir.1978), the court struck down rules changing the licensing requirements for tour brokers under the Interstate Commerce Act (ICA), 49 U.S.C. §§ 302–05, 311, 320 (1982). The notice stated that the Interstate Commerce Commission was initiating proceedings to determine the need for unspecified legislative amendments to the ICA; the notice did not mention any proposed rule changes. In that case, the noticed action was wholly dissimilar to the action subsequently taken; here, the noticed action was identical in effect to the action ultimately taken, with the exception of duration. In *Buschmann v. Schweiker,* 676 F.2d 352 (9th Cir.1982) and *Western Oil & Gas Association v. United States Environmental Protection Agency,* 633 F.2d 803 (9th Cir.1980), we struck down regulations promulgated without any notice at all. Neither case con-

---

9. The BLM's revised FLPMA regulations, promulgated after the Conservation Area withdrawal, specify the exact requirements of a section 204(b) notice. 43 C.F.R. § 2310.1–2 (1985). The notices here complied with most, but not all, of those specifications. The most significant discrepancy is the failure to state the proposed duration of the withdrawal.

10. Those who like Sagebrush opposed only withdrawal of the lands certainly were provided with more than adequate notice of the action they feared. Administrative withdrawal was, from their standpoint, a less drastic action than the proposed legislative enactment set forth in the NEPA notice they actually received.

trols, since here the Secretary did provide notice of the proposed Conservation Area withdrawal.

The notice of segregation required under FLPMA serves another statutory purpose as well—to segregate the lands temporarily. 43 U.S.C. § 1714(b)(1). The segregative effect of the notice precludes adverse parties from establishing new rights in the area prior to the actual withdrawal. Public Land Law Review Commission, *Study of Withdrawals and Reservations of Public Domain Lands* 482 (1969); *see also* H.R.Rep. No. 1724, Joint Statement of the Committee of Conference, 94th Cong., 2d Sess. 58, *reprinted in* 1976 U.S. Code Cong. & Ad. News 6175, 6228, 6230. Sagebrush does not allege that it or anyone else was harmed, nor state how it or anyone else might have been harmed, by the Secretary's failure to segregate the lands prior to the withdrawal. We believe that a failure to give notice of segregation does not in any event invalidate a subsequent administrative withdrawal. A failure to segregate means only that the lands remain subject to filings in the interim. It is those filings, and not the failure to give notice, that could have some effect on a proposed withdrawal, but only by forcing the government to buy out the intervening claimholders or abandon its withdrawal plans. The record is silent on whether the Secretary received any nuisance filings during the moratorium on disposal of lands that existed within the study area both prior and subsequent to the notice and hearings. Even if the Secretary did receive such filings, we fail to see how Sagebrush could show the existence of any legal injury therefrom. We note as well that the moratorium on the disposal of lands within the study area protected the area in much the same manner as would have a notice of segregation. We conclude that no harm resulted from the Secretary's failure to segregate the lands under section 204(b)(1) prior to the withdrawal.

Having determined that the notices, though technically not in compliance in every respect with section 204(b), nevertheless fully satisfied the purposes of that section and thus rendered the minimal failure to comply harmless, we now analyze Sagebrush's arguments why the hearings on the DEIS did not satisfy FLPMA's hearing requirement.

B. Adequacy of the Hearings.

■ Sagebrush argues that because the hearings on the withdrawal of the Conservation Area were held pursuant to NEPA, they cannot by definition satisfy FLPMA's hearing requirement. Sagebrush bases this argument on "strict construction" of section 204(h) and on alleged congressional intent.

We agree that FLPMA's procedural requirements should be "strictly construed." Strict construction, however, is not construction by label. The fact that the hearings were designated as NEPA hearings and not as FLPMA hearings does not resolve the question whether Sagebrush received a full and fair opportunity for a hearing on the proposed administrative withdrawal. Sagebrush argues, however, that Congress would not have enacted a hearing requirement in FLPMA if a NEPA hearing were adequate, since FLPMA was enacted subsequent to NEPA. This assumption is incorrect.

The legislative history of FLPMA does not suggest that Congress considered the impact of NEPA in enacting the procedural requirements of section 204. Even if Congress had considered the availability of hearings under NEPA, however, it could not have ensured that the public would be heard prior to *all* administrative withdrawals unless it enacted a hearing requirement in FLPMA itself. The Council on Environmental Quality regulations require a hearing on a DEIS only under specified circumstances. *See* 40 C.F.R. § 1506.6(c) (1985). Even if those circumstances were to be construed to encompass nearly every DEIS, NEPA requires that an agency prepare an environmental impact statement (EIS) only for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C)

(1982). Since Congress could not predict with certainty which administrative withdrawals would require an EIS under NEPA, it could not rely on NEPA's procedural protections to guarantee the public an opportunity for a hearing on all withdrawals.

That a NEPA hearing *may* fulfill FLPMA's hearing requirement is supported by a line of cases which holds that compliance with NEPA's agency consultation requirement satisfies a similar requirement in the Fish and Wildlife Coordination Act of 1958 (FWCA), 16 U.S.C. §§ 661–664 (1982). *Texas Committee on Natural Resources v. Marsh*, 736 F.2d 262, 267–68 (5th Cir.1984) (and cases cited therein). Sagebrush unsuccessfully seeks to distinguish those cases on the ground that because the FWCA is "a statute of limited scope" enacted prior to NEPA, a statute "of general scope," its procedures are subsumed in the latter statute, whereas because FLPMA is a statute of "particular application" enacted subsequent to NEPA, its procedures cannot be subsumed within those of NEPA. For the reasons we have already explained, we do not infer from the enactment of FLPMA's hearing requirement that Congress intended to require duplication of a previously conducted, adequate NEPA hearing. Moreover, the cases in question did not base their holdings on order of enactment or relative generality of the FWCA and NEPA. Rather, the courts evaluated the relevant statutory requirements functionally to determine whether compliance with one statute would necessarily entail compliance with the other. *See, e.g., Environmental Defense Fund, Inc. v. Froehlke*, 473 F.2d 346, 356 (8th Cir.1972) (if an agency "complies with NEPA in good faith, it will 'automatically take into consideration all of the factors required by the Fish and Wildlife Act and it is not reasonable to require them [sic] to do both separately'") (quoting *Environmental Defense Fund, Inc. v. Corps of Engineers*, 325 F.Supp. 749, 754 (E.D.Ark. 1971)).

Sagebrush cites *Campbell v. United States Department of Agriculture*, 515

F.Supp. 1239 (D.D.C.1981) and *Maryland v. Train*, 415 F.Supp. 116 (D.Md.1976), in support of its claim that the Secretary should have held a second set of hearings on the administrative withdrawal of the Conservation Area. Neither case supports the conclusion Sagebrush would have us draw.

In *Campbell v. United States Department of Agriculture*, the United States Department of Agriculture and the Department of Health, Education and Welfare had promulgated regulations that significantly curtailed a right of food stamp recipients under the Food Stamp Act, 7 U.S.C. §§ 2011–29 (1982). The agencies justified the curtailment on the ground that full implementation of that right would be administratively inefficient or infeasible. The court rejected that argument and held that the agencies had no discretion "not to implement their statutory mandate because ... of the practical problems they perceive in doing so." *Campbell*, 515 F.Supp. at 1249. Here, the Secretary did hold hearings on the withdrawal of the Conservation Area. He does not argue against the full implementation of the public's right to be heard, but rather against a construction of FLPMA that would require duplicative hearings on essentially the same action.

In *Maryland v. Train*, the Environmental Protection Agency issued an ocean dumping permit to Camden, New Jersey, without holding a hearing as required by the Marine Protection, Research and Sanctuaries Act of 1972, 33 U.S.C. § 1412(a) (1982) (the Ocean Dumping Act). The agency justified its inaction on the ground that it had amassed sufficient information on Camden's situation during a previous hearing on the issuance of a dumping permit to Philadelphia for the same site. The court disagreed and ordered a hearing, noting the dissimilarities between the situations of the two permittees. *Train*, 415 F.Supp. at 122. Because awarding a permit to Philadelphia and awarding a permit to Camden are two different actions, based in part on considerations unique to each permittee, the court held that each permit application triggered the hearing require-

ment of the Ocean Dumping Act. In this case, withdrawal of the lands by Congress was identical to withdrawal by the Secretary, with the exception of duration. As we discuss below, both forms of withdrawal were appropriate subjects for consideration at the set of hearings that was conducted and in fact some participants specifically addressed the administrative withdrawal alternative. In *Maryland v. Train,* on the other hand, the considerations governing the issuance of a permit to Camden could not properly have been addressed at the hearing on Philadelphia's permit.

We find the Eighth Circuit's functional analysis in *Environmental Defense Fund, Inc. v. Froehlke, supra,* to be sound. In this case the appropriate inquiry is whether the NEPA hearings provided the public with a full and fair opportunity to be heard on the concerns relevant under FLPMA to the administrative withdrawal of the Conservation Area.

As a threshold matter, Sagebrush argues that there was no proposal to withdraw the Conservation Area administratively at the time of the NEPA hearings. We reject that contention, for it fails to take into account NEPA's alternative action requirement. NEPA provides that environmental impact statements must include an analysis of alternatives to the proposed action. 42 U.S.C. § 4332(2)(C)(iii). This requirement is central to NEPA's goal of promoting environmentally sound decision-making. *See* 40 C.F.R. § 1502.14 (1985) (the section in the environmental impact statement containing the analysis of "[a]lternatives including the proposed action . . . is the heart of the environmental impact statement. . . . [I]t should present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public."); *see also* 42 U.S.C. § 4332(2)(B); 40 C.F.R. § 1500.1(c) (1985). Not only does an alternative action provide an important source of comparison to the proposed action, it may itself be selected as the proposed action. *See California v. Block,* 690 F.2d 753, 772 (9th Cir.1982).

The administrative withdrawal of the Conservation Area was therefore before the public as a possible agency action.

Having concluded that the NEPA hearings encompassed the administrative withdrawal of the Conservation Area, we next determine whether those hearings were adequate under FLPMA. An administrative withdrawal entails deciding whether and for what length of time to withdraw the land. FLPMA does not specify the factors relevant to those decisions, which a section 204(h) hearing should address. We consider instructive in that regard the issues which the Secretary must address in reporting a withdrawal to Congress. *See* 43 U.S.C. § 1714(c)(2). Since FLPMA requires that the Secretary consider the views of the public in administering the public lands, 43 U.S.C. § 1701(a)(5), presumably the Secretary would use the hearings to inform himself on those issues in the withdrawal report in which the public has an interest. Broadly defined, those issues are the environmental and economic impacts of the withdrawal, which bear upon both the decisions whether and for what period of time to withdraw the land.

The DEIS analyzed the environmental and the economic impacts of the Conservation Area withdrawal. Sagebrush does not allege that that analysis was deficient, so as to preclude an adequate hearing on the impact of an administrative withdrawal, nor that a NEPA hearing is so structured as to preclude the consideration of factors relevant under FLPMA to the act of administrative withdrawal. The hearings on the DEIS were clearly adequate under FLPMA on the question of whether to withdraw the Conservation Area, regardless of whether the public distinguished between congressional and administrative withdrawal, since the impact of the withdrawal (other than that attributable to its duration) and the reasons for and against it would have been identical for both the congressional and the administrative action. Whether the DEIS hearings were adequate on the question of duration is a slightly more difficult question. Although the public should ordinarily

be heard on the duration of a withdrawal, we do not believe that the Secretary erred in not holding a second set of hearings on that issue here. The public had an opportunity to address duration during the NEPA hearings. Moreover, the public's support of or opposition to congressional withdrawal provided the Secretary with an adequate indication of how the public would respond to a longer or shorter period of withdrawal.[11]

We conclude that the hearings on the DEIS were adequate under FLPMA, that they afforded the public a full and fair opportunity to be heard, and consequently that the Secretary did not err in not holding a second set of hearings on the administrative withdrawal of the Conservation Area. The rest of Sagebrush's contentions are meritless, and we do not address them.

The judgment of the district court is AFFIRMED.

---

11. Certainly Sagebrush and those with similar views and interests had made their position

clear. They were opposed to withdrawal of any kind and for any period.