**TRUSTEES FOR ALASKA, et al.,
Plaintiffs-Appellees,**

v.

**Donald P. HODEL, Secretary, United States Department of the Interior, et al., Defendants-Appellants.**

No. 86-3738.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 3, 1986.

Decided Dec. 23, 1986.

Robert Adler, Anchorage, Alaska, for plaintiffs-appellees.

Regina R. Belt, Dept. of Justice, Land & Natural Resources Div., Washington, D.C., Bruce M. Landon, U.S. Dept. of Justice, Anchorage, Alaska, Dirk D. Snel, Atty., Dept. of Justice, Washington, D.C., for defendants-appellants.

Before SNEED, KENNEDY and WIGGINS, Circuit Judges.

WIGGINS, Circuit Judge:

Section 1002(h) of the Alaska National Interest Lands Conservation Act (ANILCA), 16 U.S.C. § 3142(h), concerns the resources of the 1.5 million acre coastal plain of the Arctic National Wildlife Refuge (ANWR). Section 1002(h) requires that the Secretary of Interior (Secretary) submit a report to Congress (1002 report) containing: (1) specific information about potential oil and gas production and fish and wildlife within the coastal plain of the ANWR; and (2) recommendations concerning possible exploration, development, and production of oil and gas within the coastal plain, and what additional legal authority would be necessary to protect fish and wildlife if such development were to take place.[1] The Secretary had five years and nine months from the effective date of the statute to complete the 1002 report, which was due no later than September 2, 1986.[2]

The Secretary and the Fish and Wildlife Service seek review of the district court's order enjoining them from submitting the 1002 report to Congress until they comply with the National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321–4347 (NEPA), and its implementing regulations. The Secretary and the Service contend that: (1) the environmental groups lack standing; (2) the issues are not ripe for review; and (3) NEPA and its implementing regulations do not require public comment on a legislative proposal before its submission to Congress. We disagree on all three grounds and affirm.

## BACKGROUND

On October 2, 1985, five environmental groups—Trustees for Alaska, American Wilderness Alliance, Defenders of Wildlife, Northern Alaskan Environmental Center, and the Wilderness Society (the Trustees)—filed an action for declaratory and injunctive relief against the Department of Interi-

1. Section 1002(h) provides:

Not earlier than five years after December 2, 1980, and not later than five years and nine months after such date, the Secretary shall prepare and submit to Congress a report containing—

(1) the identification by means other than drilling of exploratory wells of those areas within the coastal plain that have oil and gas production potential and estimate of the volume of the oil and gas concerned;

(2) the description of the fish and wildlife, their habitats, and other resources that are within the areas identified under paragraph (1);

(3) an evaluation of the adverse effects that the carrying out of further exploration for, and the development and production of, oil and gas within such areas will have on the resources referred to in paragraph (2);

(4) a description of how such oil and gas, if produced within such area, may be transported to processing facilities;

(5) an evaluation of how such oil and gas relates to the national need for additional domestic sources of oil and gas; and

(6) the recommendations of the Secretary with respect to whether further exploration for, and the development and production of, oil and gas within the coastal plain should be permitted and, if so, what additional legal authority is necessary to ensure that the adverse effects of such activities on fish and wildlife, their habitats, and other resources are avoided or minimized.

16 U.S.C. § 3142(h).

2. The Assistant Secretary for Fish and Wildlife and Parks stated in a letter to the Chairman of the Committee on Interior and Insular Affairs that the Secretary intends to withhold action on the 1002 report until the outcome of this case.

or, the Secretary, the Fish and Wildlife Service, and the Director and Regional Director of the Fish and Wildlife Service (the Department). The Trustees sought a declaration requiring the Department to submit an environmental impact statement (EIS) pursuant to section 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C), before the Secretary submitted the 1002 report to Congress. The Trustees also sought a mandatory injunction requiring that the Secretary follow all necessary public participation procedures in preparing the EIS. The Trustees alleged that under NEPA and the regulations of the Council on Environmental Quality (CEQ), the Department must circulate a draft EIS for public notice and comment before submitting the 1002 report to Congress. Finally, the Trustees alleged that the Department failed to comply with the Freedom of Information Act (FOIA), 5 U.S.C. § 552.[3]

All parties filed motions for partial summary judgment on the NEPA claims. In the amended answer, the Department alleged that it would prepare a legislative environmental impact statement (LEIS), but would not circulate the 1002 report and LEIS for public comment until the report was submitted to Congress. After oral argument, the district court granted the Trustees' motion for partial summary judgment. The court determined that the Department's decision to submit the 1002 report and LEIS without first providing an opportunity for public notice and comment violated NEPA and its implementing regulations. The court's order directed the Department to prepare a draft 1002 report and LEIS, and provide for full public review and comment of the draft documents. The order further directed the Department to respond to and incorporate the public comments and suggestions into the report. The court ordered the Department to publish its responses locally before or at the time it released the final 1002 report.

The district court determined that there was no just reason for delay and entered judgment for the Trustees pursuant to Fed. R.Civ.P. 54(b) on March 6, 1986. The Department filed a timely notice of appeal on April 4, 1986.

## ANALYSIS

### I

### Standard Of Review

We review the district court's grant of partial summary judgment de novo. *See Lojek v. Thomas,* 716 F.2d 675, 677 (9th Cir.1983). We review the Secretary's action to see if it was "arbitrary, capricious, an abuse of discretion, or ... without observance of procedure required by law." 5 U.S.C. §§ 706(2)(A), (D); *see Sagebrush Rebellion, Inc. v. Hodel,* 790 F.2d 760, 763 (9th Cir.1986).

### II

### Standing

■ The Department contends that the Trustees lack standing because actual or potential impairment of their members' use of the coastal plain can only be accomplished by Congress choosing to eliminate the current statutory prohibitions against gas and oil development in the ANWR. The Department argues that mere speculation on the contents of the 1002 report and its effect on Congress does not confer standing.

The Department's characterization of this case is incorrect. The Trustees alleged in their complaint that their members had a procedural right under NEPA and the CEQ regulations to comment on the LEIS and 1002 report before the Secretary submits the report to Congress. The Trustees have standing to challenge alleged agency violations of these procedural rights. *See Western Oil & Gas Ass'n v. EPA,* 633 F.2d 803, 808 n. 4 (9th Cir.1980); *City of Davis v. Coleman,* 521 F.2d 661, 671–72 (9th Cir. 1975).

---

**3.** The complaint consists of two counts: the first count alleges NEPA violations and the second count alleges violations of FOIA. At the time of this appeal, the FOIA claim and additional FOIA claims contained in the amended complaint are still pending before the trial court.

## III

### Ripeness

The Department contends that the issues raised by the Trustees' claimed rights to comment on the draft LEIS are not ripe. It argues that the 1002 report may recommend that Congress take no action concerning the coastal plain. As current law prohibits production of gas and oil in the ANWR, 16 U.S.C. § 3143, the no-action recommendation would mean that the 1002 report would not contain a "proposal for legislation." If the report does not contain a "proposal for legislation," then no LEIS is required under NEPA, see 42 U.S.C. § 4332(2)(C), and the Trustees' claims are not ripe.

■ The doctrine of ripeness is intended "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148–49, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967). Ripeness requires an evaluation of "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Id.* at 149, 87 S.Ct. at 1515. A claim is fit for decision if the issues raised are primarily legal and do not require further factual development and the challenged action is final. *See Friedman Brothers Investment Co. v. Lewis*, 676 F.2d 1317, 1319 (9th Cir.1982).

■ Under *Abbott Laboratories*, this case is ripe for review. The disagreement here is concrete. The Department will not provide presubmission public review and comment. Its decision is clear and final and the issue is therefore fit for judicial review. Moreover, a denial of review at this point may impose substantial hardship on the Trustees. Once Congress acts on the information submitted to it, the Trustees will lose their right to comment on the draft LEIS at the administrative level.

The Department is being less than candid in arguing that the 1002 report may not contain a "proposal for legislation." The Department has already decided to provide an LEIS with the 1002 report, presumably because it expects the 1002 report to contain a "proposal for legislation."[4] Further, an LEIS appears necessary, because the no-action alternative is unlikely. The express language of section 1002(h) provides for a five-year study and requires specific recommendations on the future use of the coastal plain. Since the purpose of the 1002 report is to determine either to allow further oil and gas development or to designate the coastal plain for wilderness preservation, see S.Rep. No. 413, 96th Cong., 2d Sess. 240–41, *reprinted in* 1980 U.S.Code Cong. & Ad.News 5070, 5184–85, the report will likely recommend some change in the status quo and so will likely contain a "proposal for legislation."[5] Waiting until the Department actually submits the 1002 report to Congress could cause the Trustees to lose their claimed rights to presubmission comment. Waiting is also unnecessary in view of the Department's decision to submit an LEIS with the report.[6]

---

**4.** The Department intends to prepare an LEIS, which will be integrated into the 1002 report.

**5.** The congressional request for specific recommendations within a specific region distinguishes this case from *Kleppe v. Sierra Club, Inc.*, 427 U.S. 390, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976), a case in which the Court determined that the contemplation of a project is insufficient to require an EIS under NEPA. It is also significant that here the Secretary has already agreed to submit an LEIS, thus disposing of the Court's concern in *Kleppe* that premature and

unnecessary statements will be filed. 427 U.S. at 406, 96 S.Ct. at 2728.

**6.** The Department relies on *Bennett Hills Grazing Ass'n v. United States*, 600 F.2d 1308, 1309 (9th Cir.1979), for its argument that this case is not ripe. This court's decision in *Bennett Hills* is, however, distinguishable. In *Bennett Hills*, this court vacated the district court's order enjoining the Bureau of Land Management (BLM) from preparing a final EIS until the appellees had ninety days in which to comment on BLM's draft statement. In *Bennett Hills*, however, the BLM complied with the regulations and solic-

## IV

### Procedural Rights Under NEPA

■ NEPA is essentially a procedural statute designed to insure that environmental issues are given proper consideration in the decisionmaking process. *See City of Davis v. Coleman*, 521 F.2d 661, 670 (9th Cir.1975). Section 102(2)(C) of NEPA requires agencies to include a detailed environmental impact statement with "proposals for legislation and other major federal actions significantly affecting the quality of the human environment...." 42 U.S.C. § 4332(2)(C). Congress has directed that the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies of NEPA "to the fullest extent possible." 42 U.S.C. § 4332; *Lathan v. Brinegar*, 506 F.2d 677, 687 (9th Cir.1974) (en banc).

By Executive Order, the CEQ issued regulations to federal agencies for implementing NEPA. Exec.Order No. 11991, 42 Fed. Reg. 26,967 (1977). The CEQ regulations are binding on all federal agencies and provide formal guidance to the courts for interpreting NEPA requirements. 43 Fed. Reg. 55,978 (1978). The CEQ's interpretation of NEPA is entitled to substantial deference. *Andrus v. Sierra Club*, 442 U.S. 347, 358, 99 S.Ct. 2335, 2341, 60 L.Ed.2d 943 (1979). Thus, the Trustees may have a right to comment on the draft LEIS before the Secretary submits the 1002 report to Congress if the CEQ regulations require such a procedure.

### A. Modified Procedures for Legislative Proposals

The CEQ regulations provide for several stages in the preparation of an EIS. Generally, an agency must prepare a draft EIS and obtain comments on the draft from the appropriate federal agency. 40 C.F.R. § 1503.1 (1985). An agency must also request comments from state and local agencies, and the public, and affirmatively solicit comments from interested or affected persons and organizations. *Id.* In preparing a final EIS an agency must consider and respond to the comments. 40 C.F.R. § 1503.4 (1985). The comments must be included with the final EIS. *Id.*

Section 1506.8 establishes a modified procedure for preparing an EIS on legislative proposals. Except for specified exceptions, section 1506.8 permits an agency to transmit a single LEIS to Congress and to federal, state, and local agencies, and the public for review and comment. No final, revised EIS is necessary. 43 Fed.Reg. 55,978, 55,-987 (1978).

### B. Exception to Modified Procedures for Study Processes

The Trustees contend that the proposal here falls within one of the specified exceptions set forth in section 1506.8 and therefore the Department must provide presubmission public comment. Subsection 1506.-8(b)(2)(ii) provides that proposals resulting from a "study process required by statute" must follow the normal draft/final procedures established in section 1503.1.[7]

The Department contends that the 1002 report is not a "study process required by

ited comments on its draft EIS. 600 F.2d at 1309. Here, the Department has made its position clear that it will not permit *any* public comments on the draft LEIS before it is submitted to Congress.

The Department also relies on CEQ regulation section 1500.3, which states that "[i]t is the Council's intention that judicial review of agency compliance with the regulations [providing for public comment on draft statements] not occur before an agency has filed the final environmental impact statement...." Ripeness is, however, a constitutional doctrine. Here, there is no indication that in creating the CEQ Con-

gress intended to give the Council the power to limit judicial review. *See* 42 U.S.C. §§ 4342, 4344.

7. Section 1506.8(b)(2) provides that the procedures requiring both a draft and final EIS with agency requests for public comment shall be followed when:

(ii) The proposal results from a study process required by statute (such as those required by the Wild and Scenic Rivers Act (16 U.S.C. § 1271 et seq.) and the Wilderness Act (16 U.S.C. § 1131 et seq.)).

40 C.F.R. § 1506.8(b)(2)(ii) (1985).

statute" within the meaning of the regulations. It asks the court to contrast the 1002 report with the Wild and Scenic Rivers Act, 16 U.S.C. §§ 1271–1287, and the Wilderness Act, 16 U.S.C. §§ 1131–1136, the two examples of a "study process" given in subsection 1506.8(b)(2)(ii). The Department contends that unlike section 1002(h), these Acts require outside participation in formulating their respective studies. Here, the Department argues, Congress does not desire outside participation but has specifically requested information and recommendations from the Secretary alone.[8]

We find that section 1002(h) is a study process required by statute under subsection 1506.8(b)(2)(ii). Section 1002(h) contains a "study process" within the ordinary meaning of the term. Section 1002(h) sets forth detailed requests for information that require research, and grants the Secretary five years and nine months in which to gather the information and present it to Congress. The example Acts contain similar requests for information within set time frames and also require submission of various reports to Congress. *See* 16 U.S.C. §§ 1132, 1136, 1275(a). The detailed research request and the extended time provided for that research in section 1002(h) convinces us that the 1002 report is part of a "study process required by statute."[9]

Moreover, the CEQ regulations make clear that the main reason for following a modified procedure for legislative statements is a concern that the LEIS be submitted to Congress before Congress acts. In its summary of major innovations in the regulations, the CEQ states that the regulations provide accelerated procedures for legislative proposals "to fit better with Congressional schedules." 43 Fed.Reg. 55,978, 55,979 (1978). In its comments to section 1506.8, the CEQ states that the timing of votes and hearings for legislative proposals is not within the agency's control. 43 Fed.Reg. 55,978, 55,988 (1978). Section 1500.5(j) states that agencies shall reduce delay by using accelerated procedures for proposals for legislation. 40 C.F.R. § 1500.5(j) (1985). This time concern does not exist when a "study process" includes a set time frame that permits the agency to anticipate and plan for congressional schedules. In fact, it is doubtful that when Congress specifically requests information and recommendations from an agency in the context of a study process— as it did here and in the two example Acts—that Congress will act without the agency's report.

Congress requires federal agencies to comply with the policies of NEPA to the fullest extent possible. 42 U.S.C. § 4332. One of the policies of NEPA is to encourage and facilitate public involvement in decisions concerning environmental issues. 40 C.F.R. § 1500.2(d) (1985). In fact, the CEQ regulations interpret NEPA to require public comment generally. *See, e.g.,* 40 C.F.R. §§ 1500.1(b), 1500.2(b), (d), 1503.-1, 1506.6. The modified procedures for legislative proposals appear to be a narrow exception, not the norm. In view of the stated purpose of NEPA, we hold that the Department failed to comply with subsection 1506.8(b)(2)(ii) by deciding to submit

---

8. The Department also contends that by preconditioning the Secretary's report to Congress, the district court's injunction unconstitutionally hinders the legislative process. This argument assumes, however, that the district court's injunction requires a procedure not found in the CEQ regulations. If the CEQ regulations require public comment at the administrative level, then the district court's order simply enforces Congress's mandate under NEPA and does not violate the separation of powers doctrine.

9. Section 1002(h) is also part of a larger study, the Federal North Slope Lands Study Program. S.Rep. No. 413, 96th Cong., 2d Sess. 239–43, 292–96, *reprinted in* 1980 U.S.Code Cong.Ad. News 5070, 5183–87, 5236–41. That study is indistinguishable from the Wild and Scenic Rivers Act and the Wilderness Act in that it too provides for outside participation in certain sections. *See, e.g.,* 16 U.S.C. § 3142(c), (e)(2). To require specific reference to outside participation in section 1002(h) itself, however, interprets the term "study process required by statute" too narrowly.

the 1002 report without an opportunity for public comment.[10]

## V

## Attorneys' Fees

■ The claim by the Trustees for attorneys' fees is denied. The claim is made under the Equal Access to Justice Act (EAJA), 28 U.S.C. § 2412(d). EAJA provides that attorneys' fees are available to a prevailing party in a civil action against the United States unless "the position of the United States was substantially justified." 28 U.S.C. § 2412(d)(1)(A). Although we rule against the Department, it argued forcefully and well for its position. Its position was at all times justified, although erroneous.

AFFIRMED.

SNEED, Circuit Judge, dissenting:

I respectfully dissent from the portion of the opinion that concludes that the 1002 report is a "study process" within the meaning of 40 C.F.R. § 1506.8(b)(2)(ii) (1985).

The majority decides that the Secretary must prepare a draft LEIS, request comments, and respond to the comments in its final LEIS in order to comply with NEPA. *See* 40 C.F.R. §§ 1503.1–1503.4 (1985). This is a considerable gloss on the language of NEPA, which asks only for "a detailed statement by the responsible official" describing the environmental impact. 42 U.S.C. § 4332(2)(C). The only authority for the gloss is the CEQ regulations. The chairman of the CEQ, however, has deter-

mined that only one LEIS is necessary under section 1002(h). 1 Excerpt of Record at 48. Because the chairman of the CEQ is an officer charged with administering the regulation, his interpretation of the regulation has "controlling weight." *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); *Buschmann v. Schweiker,* 676 F.2d 352, 355 (9th Cir.1982). No additional basis for the chairman's interpretative authority is necessary, contrary to the majority's intimations in footnote 10.

Even without the chairman's guidance, I would be reluctant to conclude that the 1002 report is a study process. The language of section 1002(h), augmented by the pertinent legislative history, is too slight a skeleton to bear the weight of the procedures that the majority imposes. The regulation gives two examples of statutes that require a study process. One explicitly provides for public participation. 16 U.S.C. § 1132(d). The other explicitly mentions "studies" and provides for participation by the heads of other federal agencies and state governors. 16 U.S.C. § 1275. The statute at issue here briefly outlines the contents of the required report and names no participant except the Secretary. 16 U.S.C. § 3142(h). Despite the generous length of time that the statute gives the Secretary to complete his report, I do not find that Congress here describes a study process.

---

**10.** The Department argues that the Chairman of the CEQ agrees with its interpretation of subsection 1506.8(b)(2)(ii) and that the court must give the Chairman's interpretation of the CEQ regulations "controlling weight." *Compare Udall v. Tallman,* 380 U.S. 1, 16–17, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); *Sierra Club v. Clark,* 756 F.2d 686, 690 (9th Cir.1985). Although asked to do so repeatedly at oral argument, the Department was unable to point to any basis for the Chairman's authority to interpret the regulations, other than the affidavit of the CEQ's General Counsel stating that the current CEQ Chairman has assumed sole responsibility for issues

involving NEPA and that the General Counsel consults with the Chairman on the interpretation of the CEQ regulations. The statute creating the Chairman's position makes no reference to his duties. 42 U.S.C. § 4342. The statute designating the duties of the Council refers to the Council as a whole. 42 U.S.C. § 4344. Executive order 11991 authorizing the Council to promulgate regulations does not grant the Chairman any special powers to interpret or administer the regulations. Exec.Order No. 11991, 42 Fed.Reg. 26,967–68 (1977). Thus, we are not convinced that the Chairman's interpretation is "controlling" or correct in this case.