**NATURAL RESOURCES DEFENSE COUNCIL, et al., Plaintiffs,**

v.

**Manuel LUJAN, Secretary of the U.S. Department of the Interior; U.S. Department of the Interior, Defendants.**

**GWICH'IN STEERING COMMITTEE, Plaintiff,**

v.

**Manuel LUJAN, Secretary of the U.S. Department of the Interior; U.S. Department of the Interior, Defendants,**

**and**

**Arctic Slope Regional Corporation and Kaktovik Inupiat Corporation, Defendant–Intervenors.**

**Civ. A. Nos. 89–2345 (JHG), 89–2393 (JHG).**

United States District Court, District of Columbia.

July 22, 1991.

Eric Smith, Anchorage, Alaska, Robert W. Adler, NRDC, Inc., Washington, D.C., Sarah Chasis, NRDC, Inc., New York City, for plaintiffs.

Gary B. Randall, Anthony P. Hoang, Attys., U.S. Dept. of Justice, Land & Natural Resources Div., General Litigation Section, Washington, D.C., for defendants.

David C. Crosby, Wickwire, Greene, Crosby & Seward, Anchorage, Alaska, Steven T. Seward, James Wickwire, Wickwire, Greene & Seward, Seattle, Wash., Sam Kalen, Alan Mintz, Van Ness, Feldman, Sutcliffe & Curtis, Mark N. Savit, L. Poe Legette, Thad S. Huffman, Jackson & Kelly, Washington, D.C., for intervenor defendants.

William W. Garner, John Wyeth Griggs, Birch, Horton, Bittner & Cherot, Washington, D.C., for amicus.

## MEMORANDUM OPINION AND ORDER

JOYCE HENS GREEN, District Judge.

In these consolidated actions, plaintiffs challenge a legislative environmental impact statement ("LEIS") accompanying a statutorily mandated report conducted by defendants concerning the future management of the coastal plain of the Arctic National Wildlife Refuge ("ANWR") in Alaska. Defendants and defendant-intervenors filed a motion to dismiss the complaints. Subsequently, plaintiffs filed a motion for a preliminary injunction to compel defendants to circulate as a draft supplemental environmental impact statement ("SEIS") a recent report issued by defendants. A hearing was held on the latter motion. As explained below, the motion to dismiss is granted in part and denied in part, the motion for preliminary injunction is denied, but declaratory judgment is entered for plaintiffs on one claim raised in the preliminary injunction motion.

## I. BACKGROUND

### A. Statutory Framework and History

ANWR, established in 1960 to preserve the area's unique wildlife, wilderness, and recreational values, was included in the sixteen National Wildlife Refuges created by Congress in Alaska in the Alaska National Interest Lands Conservation Act, Pub.L. No. 96–487, 94 Stat. 2449 (1980) (codified at 16 U.S.C. §§ 3101 *et seq.*) ("ANILCA"). ANWR covers approximately 19 million acres, of which 1.55 million acres make up the coastal plain and are designated as an area of study. *See id.* § 1002, 16 U.S.C. § 3142. The coastal plain's value stems

from its status as the most biologically productive area of ANWR and its use by a large number and diversity of fish and wildlife, including as calving grounds for the migratory Porcupine Caribou Herd. *See* U.S. Department of the Interior, 1 *Arctic National Wildlife Refuge, Alaska, Coastal Plain Resource Assessment: Report and Recommendation to the Congress of the United States and Final Legislative Environmental Impact Statement ("ANWR Report")* 1 (Apr. 1987).

The largest deposit of oil and gas discovered in North America, the Prudhoe Bay Oilfield, lies sixty miles west of ANWR. In 1978, the Senate Energy and Natural Resources Committee reported that the northwestern corner and the central coastal plain of the Arctic Range were probably among the best prospects for oil and gas development in arctic Alaska. S.Rep. No. 1300, 95th Cong., 2d Sess. 154, 203–04 (1978). Later, the Committee concluded that the information concerning the effect on the environment of the development and production of such resources was uncertain and conflicting. S.Rep. No. 413, 96th Cong., 1st Sess. 241 (1979). The inadequacy of the available information helped lead to and inform the enactment of the ANILCA sections at the center of the instant controversy.

Sections 1002 and 1003 of ANILCA, 16 U.S.C. §§ 3142, 3143, in essence defer Congressional decision on ANWR until certain information is gathered on the area and findings and recommendations submitted. This legislated decisionmaking process requires the Secretary of the Interior ("Secretary") to conduct and publish a biological assessment (a continuing study of the coastal plain's fish and wildlife and their habitat) within eighteen months of ANILCA's enactment. This "baseline study," ultimately published by the Interior Department's Fish and Wildlife Service, was to be updated to include revisions thereto. ANILCA § 1002(c), 16 U.S.C. § 3142(c). At the same time, the statute required the Secretary to establish, in regulations

grounded in the results of the baseline study, initial guidelines to govern the conduct of exploratory activities, and to publish these guidelines within two years of ANILCA's enactment. *Id.* § 1002(d), 16 U.S.C. § 3142(d). The statute prohibited approval of any exploration plans for the area during that period. *Id.* § 1002(e)(2), 16 U.S.C. § 3142(e)(2). A further subsection required that along with the guidelines, an environmental impact statement be conducted on the exploration regulations. *Id.* § 1002(d)(2), 16 U.S.C. § 3142(d)(2). The guidelines were to be revised to reflect any changes in the baseline study and any other appropriate information that became available. *Id.* The initial baseline report was published in 1982 and the final baseline report was published in 1986, after revisions; the exploration activities EIS was issued in 1983, as were the § 1002(d) regulations. *ANWR Report* at 3; *see* 50 C.F.R. § 37.[1]

The subsection at issue here, subsection 1002(h) of the statute, required the Secretary to prepare a report ("§ 1002 Report") containing his findings and recommendations concerning the coastal plain and to submit this report to Congress between five years and five years and nine months after the enactment of ANILCA. 16 U.S.C. § 3142(h). Congress specified that the § 1002(h) Report contain the following:

(1) the identification by means other than drilling of exploratory wells of those areas within the coastal plain that have oil and gas production potential and estimate of the volume of the oil and gas concerned;

(2) the description of the fish and wildlife, their habitats, and other resources that are within the areas identified under paragraph (1);

(3) an evaluation of the adverse effects that the carrying out of further exploration for, and the development and production of, oil and gas within such areas will have on the resources referred to in paragraph (2);

---

1. The baseline study, the exploration EIS and the exploration regulations have not been challenged.

(4) a description of how such oil and gas, if produced within such an area, may be transported to processing facilities;

(5) an evaluation of how such oil and gas relates to the national need for additional domestic sources of oil and gas; and

(6) the recommendations of the Secretary with respect to whether further exploration for, and the development and production of, oil and gas within the coastal plain should be permitted and, if so, what additional legal authority is necessary to ensure that the adverse effects of such activities on fish and wildlife, their habitats, and other resources are avoided or minimized.

*Id.* § 3142(h)(1)–(6). Section 1003 expressly prohibits oil and gas leasing and other development leading to production in ANWR, as well as oil and gas production therefrom, until authorized by Act of Congress. *Id.* § 3143.[2]

The Secretary initially intended to submit the § 1002 Report by itself to Congress, but then added an LEIS. However, the Secretary attempted to submit the LEIS without prior public circulation. In 1986, the Ninth Circuit held that the Secretary had violated the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.* ("NEPA"), by failing to submit a draft of the LEIS for public comment. *Trustees for Alaska v. Hodel,* 806 F.2d 1378 (9th Cir.1986).[3] After circulation of the draft, the § 1002 Report and final LEIS were subsequently prepared and submitted to Congress as one integrated document in May 1987.[4] Congress has not enacted any laws as a result of the *ANWR Report* as of

this date, although it has held over forty hearings in various committees on the subject of ANWR.

After plaintiffs filed these suits, the Interior Department issued a report prepared by its Bureau of Land Management ("BLM") entitled "Overview of the 1991 Arctic National Wildlife Refuge Recoverable Petroleum Resource Update" (BLM, Apr. 1991) ("*1991 Overview*"). The *1991 Overview* updates the assessment of the 1987 *ANWR Report* and states that it "makes a considerable contribution to the knowledge and understanding of the 1002 area" and, among other changes, revises the *ANWR Report*'s assessment of the marginal probability of economic success in tapping oil reserves in ANWR from 19 percent to 46 percent. This report, which was provided to Congress as part of testimony by the Secretary and others, does not identify the sources of data on which its conclusions are based, and was not circulated to the public prior to its release.

B. The Original Lawsuit

Plaintiffs are a collection of national and local Alaskan environmental organizations,[5] as well as the Gwich'in Steering Committee, a corporation made up of Native members and governments of the Gwich'in-speaking villages in northeastern Alaska and northwestern Canada. Their complaints[6] allege that the Secretary did not fulfill Congress' mandate that the issues identified by § 1002 of ANILCA and NEPA be studied thoroughly, credibly, and objectively. They also assert that the Department of the Interior's administration of the study program violated statutory re-

2. A further subsection withdraws all public lands within the coastal plain from all forms of entry or appropriation under the mining laws and from operation of mineral leasing laws of the United States while the studies were being conducted and published and until further act of Congress. *Id.* § 3142(i).

3. Former Interior Secretary Watt's attempt to transfer responsibility for the study program from the Fish and Wildlife Service to the U.S. Geological Survey was also rejected by the courts. *Trustees for Alaska v. Watt,* 524 F.Supp. 1303 (D.Alaska 1981), *aff'd per curiam,* 690 F.2d 1279 (9th Cir.1982).

4. EISs may be integrated with other agency documents. 40 C.F.R. § 1506.4.

5. The following organizations brought this action: Natural Resources Defense Council; National Wildlife Federation; National Audubon Society; The Wilderness Society; Northern Alaska Environmental Center; National Parks and Conservation Association; Defenders of Wildlife; and the Sierra Club.

6. These substantially identical actions were consolidated by Order filed December 19, 1989.

quirements and that its actions and omissions since 1981 demonstrate that it has always intended to recommend full leasing of the coastal plain, a bias reflected in the technical and legal inadequacies of the *ANWR Report.* Plaintiffs claim that these actions and omissions violate NEPA and ANILCA and that they are arbitrary and capricious, an abuse of discretion and therefore also violate the Administrative Procedure Act, 5 U.S.C. § 706 ("APA"). For relief, plaintiffs seek a declaratory ruling that defendants violated NEPA and ANILCA, as well as an injunction directing defendants to comply with these statutes by revising the LEIS or preparing a supplemental LEIS.

Defendants, the Secretary of the Department of the Interior and the Department of the Interior, move to dismiss the complaint on the following grounds: plaintiffs lack standing to sue because they have not shown injury in fact and because they are not within the zone of interests protected by § 1002; the adequacy of the § 1002 Report is not justiciable; section 1002 precludes revision or supplementation of the LEIS; and, plaintiffs' claim under § 810 of ANILCA, 16 U.S.C. § 3120, is not ripe. Intervenor-defendants, the Arctic Slope Regional Corporation ("ASRC") and the Kaktovik Inupiat Corporation ("KIC"), Alaska Native Corporations that own legal interests in lands within ANWR,[7] adopt and supplement defendants' arguments, as does *amicus curiae* North Slope Borough ("NSB"), a unit of municipal government of the State of Alaska.[8]

## C. Motion for Preliminary Injunction

On June 28, 1991, plaintiffs filed a motion for preliminary injunction to compel defendants to issue the *1991 Overview* in the form of a draft supplement to the LEIS on the § 1002 Report for public review and comment pursuant to 40 C.F.R. § 1502.9. They also request an injunction ordering defendants to release to the public all nonconfidential data and all defendants' analyses thereof relied on in preparing the *1991 Overview.*

Defendants oppose the motion. In addition to their reasons for dismissing the entire action, they claim that plaintiffs cannot meet the rigorous requirements for injunctive relief. In particular, they contend that plaintiffs cannot succeed on the merits because the *1991 Overview* does not present "significant new information" within the meaning of applicable NEPA regulations. Defendant-intervenors claim that LEISs are not subject to the supplementation requirement under any circumstances. As to the request for the release of the underlying data, defendants contend that issue is moot because plaintiffs received the pertinent nonconfidential information through a Freedom of Information Act ("FOIA") request. Certain proprietors of data that may have been employed in preparing the *1991 Overview,* who were permitted to intervene at this stage of the proceedings,[9] urge the Court not to grant plaintiffs' second request because it would cause them irreparable injury.

## II. MOTION TO DISMISS

### A. NEPA Standing

At the outset, plaintiffs claim that defendants are collaterally estopped from raising the issue of plaintiffs' standing under NEPA because that issue was fully litigated and decided in their favor in *Trustees for Alaska v. Hodel,* 806 F.2d 1378 (9th Cir.1986). In that case—essentially a precursor to this action—the Ninth Circuit held that a district court had properly en-

---

**7.** These corporations were organized under the Alaska Native Claims Settlement Act, 43 U.S.C. §§ 1601 *et seq.* ("ANSCA"). ASRC is wholly owned by the Inupiat Eskimos of the Arctic Slope region; KIC is wholly owned by the Village of Kaktovik. One township conveyed to KIC by ANSCA is within the ANWR coastal plain study area under § 1002 of ANILCA. ASRC owns the subsurface underlying this and other KIC lands.

**8.** NSB has civil, criminal, and zoning jurisdiction over that part of arctic Alaska that encompasses ANWR. The Court granted NSB leave to file its brief *amicus curiae* by Order dated December 1, 1989.

**9.** *See* Order filed July 16, 1991.

joined the Secretary from submitting the § 1002 Report without circulating a draft EIS thereon for public notice and comment. Defendants there (the same defendants here) had urged reversal of the lower court's ruling because, *inter alia*, plaintiffs did not have standing. The court summarily rejected their arguments:

> The Trustees alleged in their complaint that their members had a procedural right under NEPA and the CEQ regulations to comment on the LEIS and 1002 report before the Secretary submits the report to Congress. The Trustees have standing to challenge alleged agency violations of these procedural rights.

806 F.2d at 1380. Defendants claim that this action involves a fundamentally different issue and therefore collateral estoppel cannot apply. They point out that the Ninth Circuit did not rule on whether plaintiffs here would have standing to challenge the adequacy—the substance—of the § 1002 Report and LEIS, which are currently before Congress, or to force revision or supplementation of the § 1002 Report and LEIS.

■■■ Collateral estoppel applies to bar relitigation of an issue that a court of competent jurisdiction has actually and necessarily decided. In other words, the former decision is conclusive in a subsequent suit involving a party to the prior litigation. *See Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979); *Clark–Cowlitz Joint Operating Agency v. FERC*, 826 F.2d 1074, 1079 (D.C.Cir.1987) (en banc), *cert. denied*, 485 U.S. 913, 108 S.Ct. 1088, 99 L.Ed.2d 247 (1988). It is the identity of the issues that is contested here. Plaintiffs claim that the difference lies "only in the specifics of NEPA compliance alleged." Those specifics, however, are significant enough to preclude the use of collateral estoppel. In *Trustees*, plaintiffs were wholly denied their rights under NEPA to comment on the draft LEIS, and the Court ruled they had standing to challenge that deficiency. Here, plaintiffs wish to exercise their pur-ported right to have the final EIS be adequate. Thus, plaintiffs' attempt to invoke collateral estoppel as to their standing in this action must be rejected.

■■ At the same time, however, defendants are not correct that *Trustees* has no bearing here. The Ninth Circuit did decide one critical issue fully litigated there and again raised here: whether the LEIS accompanying the § 1002 Report is governed by the exemption for legislative environmental impact statements set forth in NEPA's implementing regulations. These regulations provide that "[e]xcept for proposals for legislation as provided in § 1506.8 environmental impact statements shall be prepared in two stages and may be supplemented." 40 C.F.R. § 1502.9. Section 1506.8 exempts an LEIS from the requirement that an EIS be prepared in two stages, permitting an agency to transmit a single LEIS to Congress, agencies, and the public for review and comment, except when "[t]he proposal results from a study process required by statute." *Id.* § 1506.-8(b)(2)(ii). In other words, an LEIS resulting from a study process required by statute is subject to the procedures mandating both a draft and final EIS. In *Trustees*, the Ninth Circuit found that "the modified procedures for legislative proposals appear to be a narrow exception, not the norm," 806 F.2d at 1383, and held that "section 1002(h) [of ANILCA] is a study process required by statute under subsection 1506.-8(b)(2)(ii)," *id.* This ruling, necessary to support the judgment in *Trustees, see Synanon Church v. United States*, 820 F.2d 421, 424 (D.C.Cir.1987), cannot be relitigated here.[10] That ruling has consequences here, for it means that the LEIS is subject to the same requirements as any EIS.

■■ The Court thus turns to an analysis of whether the complaints give rise to standing under NEPA.

> [A]t an irreducible minimum, Art. III requires the party who invokes the court's

---

**10.** Accordingly, defendant-intervenors' arguments that the LEIS is not subject to NEPA are groundless and need not be considered.

authority to show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant, and the injury fairly can be traced to the challenged action and is likely to be redressed by a favorable decision.

*Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (quotations omitted). "No more fundamental component of standing doctrine exists than the requirement of a presently demonstrable injury in fact directly traceable to the defendant's supposedly unlawful actions.... In addition, there must be a direct causal connection between plaintiff's asserted injury and defendant's challenged action." *Albuquerque Indian Rights v. Lujan,* 930 F.2d 49, 54 (D.C.Cir.1991) (citations omitted). Where the challenge is to administrative action, plaintiffs must also show that they are "arguably within the zone of interests to be protected or regulated" by the statutory framework within which their claims arise. *Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970).

Plaintiffs here allege two injuries in their complaints. First, plaintiffs state that the failure of the LEIS to comply with NEPA, ANILCA, and the APA makes the LEIS "so inadequate that Congress cannot expect to have the full information and analysis it needs to make its decision. Accordingly, should Congress decide, based on this document, to open the coastal plain to oil and gas leasing and development, its decision to do so will be uninformed and will adversely affect the plaintiffs," who use and enjoy that area. Complaint No. 89–2345, ¶ 5. Second, plaintiffs aver that the deficiencies in the LEIS adversely affect their public participation rights, in that they "have been and will be frustrated in their ability to participate" in the debate over the fate of the coastal plan "because

the data and analyses in the LEIS are flawed and inadequate." *Id.* ¶ 6.[11]

Defendants claim that these purported injuries—which the Court must accept as true for the purposes of a motion to dismiss [12]—are insufficient to establish the injury in fact necessary for standing under NEPA. These harms, defendants assert, are speculative and, if they occur, would be a result not of the challenged agency action but of the passage of legislation by Congress. Furthermore, they argue, plaintiffs cannot claim injury to their right to public participation because they have had (and have taken advantage of) the opportunity to present their views to the various institutions involved (*e.g.,* the Department of the Interior, Congress).

When challenging an agency's action under NEPA, plaintiffs must show that they have been "adversely affected" or "aggrieved" within the meaning of NEPA and within the zone of interests protected by the statute. NEPA's purpose of ensuring well-informed government decisions tends to lower the threshold for standing under that statute. *See Competitive Enterprise Institute v. National Highway Traffic Safety Administration,* 901 F.2d 107, 123 (D.C.Cir.1990). As our Circuit has recently held, "[t]he procedural and informational thrust of NEPA gives rise to a cognizable injury from denial of its explanatory process, so long as there is a reasonable risk that environmental harm may occur." *City of Los Angeles v. National Highway Traffic Safety Administration,* 912 F.2d 478, 492 (D.C.Cir.1990). Plaintiffs must further show that their "members have a sufficient geographical nexus to the location at which the environmental consequences are likely to be felt." *Id.* at 494.

■ Here, plaintiffs have alleged that the inadequacies of the LEIS create "a risk that serious environmental impacts will be overlooked", *id.* (quoting *City of Davis v. Coleman,* 521 F.2d 661, 671 (9th Cir.1975)), such as the full impact of the proposed

---

**11.** The allegations of injury in the other complaint in this action are substantially identical to those quoted above. *See* Complaint No. 89–2393 ¶¶ 5, 6.

**12.** *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984).

leasing on the Porcupine Caribou herd and the Gwich'in people whose livelihood depends on that species.[13] That suffices, for the purpose of a motion to dismiss, to establish injury in fact. Further, the plaintiffs assert that their members "use and enjoy" ANWR.[14] There is "no doubt that 'recreational use and aesthetic enjoyment' are among the *sorts* of interests" that NEPA was specifically meant to protect. *Lujan v. National Wildlife Federation,* — U.S. ——, 110 S.Ct. 3177, 3187, 111 L.Ed.2d 695 (1990) (emphasis original). The geographical nexus is also obviously met here. The land used by plaintiffs' members is land that will be affected by the LEIS—the ANWR coastal plain. *Cf. id.; see also City of Los Angeles,* 912 F.2d at 492–94. *See generally* Steuer & Juni, Court Access for Environmental Plaintiffs: Standing Doctrine in *Lujan v. National Wildlife Federation,* 15 *Harv.Envtl.L.Rev.* 187, 205–18 (1991).

It is also clear that plaintiffs' participation rights are within the interests protected by the statute. As recognized by this Circuit in *Realty Income Trust v. Eckerd,* 564 F.2d 447 (D.C.Cir.1977), one of the three primary interests protected by environmental impact statements is the "more informed and more effective involvement by the public before the one forum outside of the agency where the decision[ ] can be influenced." 564 F.2d at 454. If a decision subject to NEPA (such as the recommendation at issue here, as found by the Ninth Circuit) "is made without the information that NEPA seeks to put before the decisionmaker, the harm that NEPA seeks to prevent occurs." *Sierra Club v. Marsh,* 872 F.2d 497, 497 (1st Cir.1989). "NEPA's object is to minimize ... the risk of uninformed choice." *Id.* at 500. The Court also finds Judge Richey's reasoning in *Atchison, Topeka & Santa Fe Railway Co. v. Callaway,* 431 F.Supp. 722 (D.D.C.1977), persuasive and conclusive. He wrote that an LEIS is "intended by Congress to provide detailed environmental information to the public to permit them to participate in a meaningful way in further decisionmaking

both at the administrative and legislative levels. In this way, NEPA was intended to ensure that both Congress and the public will be advised of the predicted consequences of the proposed legislation and the alternatives thereto, and they will therefore be able to act responsibly thereon." *Id.* at 727. That these interests are at stake also disposes of defendants' causation argument, i.e. that it is Congressional action, not the Secretary's, that causes the harm. This is not a situation where the injury is "highly indirect and results from the independent action of some third party not before the court." *Allen v. Wright,* 468 U.S. 737, 757, 104 S.Ct. 3315, 3328, 82 L.Ed.2d 556 (1984) (quoting *Simon v. East Kentucky Welfare Rights Organization,* 426 U.S. 26, 42, 96 S.Ct. 1917, 2208, 48 L.Ed.2d 450 (1976)).

Plaintiffs have adequately alleged—and on this motion to dismiss it must be presumed true—that the inadequacy of the LEIS "presents the risk of overlooking an environmental injury that will personally affect [their] members." *City of Los Angeles,* 912 F.2d at 494.

## B. Justiciability—Separation of Powers

◼ In an argument closely related to standing, defendants also assert that the plaintiffs' claims concerning the LEIS and § 1002 Report are not justiciable. They aver that in seeking to "require the Department to revise or supplement its completed communication with Congress on an ongoing legislative matter," Defendants' Reply Memorandum at 12, plaintiffs are, in effect, asking the court to breach the separation of powers fundamental to this democratic society. Indeed separation of powers may well be the primary concern underlying standing doctrine. *See Allen,* 468 U.S. at 750, 104 S.Ct. at 3324. And it is beyond dispute that "once the legislature has made its decision to approve or not to approve a project," the courts do not have jurisdiction to review the input provided by the analysis in the LEIS. *Izaak Walton*

---

**13.** *See* Complaint No. 89–2393 ¶ 4.

**14.** *See* Complaint No. 89–2345, ¶¶ 4a–4i.

*League of America v. Marsh*, 655 F.2d 346, 358 (D.C.Cir.), *cert. denied*, 454 U.S. 1092, 102 S.Ct. 657, 76 L.Ed.2d 630 (1981). But Congress has not so acted in this instance, and the Court is not persuaded that this doctrine is implicated here.

Defendants rely on two decisions dismissing claims concerning LEISs, finding injunctive relief impermissibly intrusive on Congressional functions. In *Wingfield v. Office of Management and Budget*, 9 Env't Rep.Cas.1961 (D.D.C.1977), the court dismissed a challenge to various agencies' failure to prepare LEISs on pending mining legislation because, *inter alia*, the injury alleged was speculative and remote, and if caused, would be created by Congressional legislation—not action taken by the defendant agencies. *Id.* at 1963. In *Chamber of Commerce v. Department of the Interior*, 439 F.Supp. 762 (D.D.C.1977), the court dismissed plaintiffs' challenge to the agency's failure to prepare an LEIS on proposals submitted to Congress. It ruled that the deprivation of the opportunity to participate in the decisionmaking process did not confer standing because the proposals were in Congress and their effect on legislation too speculative. *Id.* at 766. Plaintiffs' complaint there was also determined to be deficient with regard to the redressability prong of injury in fact, because, *inter alia*, Congress might exercise its legislative powers despite any declaratory relief granted. *Id.* at 768.

These cases, which defendants find controlling, are distinguishable in several important respects. In *Wingfield*, plaintiff had asked the Court to enjoin agencies from transmitting information to Congress and to enjoin the Secretary of the Interior from testifying before a congressional committee. Similarly, in *Chamber of Commerce*, plaintiff sought to enjoin transmittal of the subject proposals to Congress. No such interference with the functions of the legislative branch is sought here. Indeed, the action requested here, if granted, would likely aid the legislative process, enabling interested parties to participate more fully and effectively. *See Atchison*, 431 F.Supp. at 727 n. 5. *Wingfield* also concerned legislation where, in contrast to ANILCA, Congress had not mandated any environmental studies.[15] And perhaps most significantly, the injury alleged was to plaintiff's economic interest should the legislation succeed. Here, plaintiffs also allege injury to their rights under NEPA. The injuries stated in the complaints before the Court do not comprise "injury in some fashion from the ongoing legislative process," 9 Env't Rep.Cas. at 1962, but from an agency's alleged failure to comply with NEPA.

And unlike the circumstances in *Chamber of Commerce*, the effect of the LEIS on legislation is far from speculative. Congress specifically requested an environmental assessment (the § 1002 Report) and clearly intends that it be used to inform the decisionmaking process. While it is technically true that Congressional action would be the source of the ultimate injury that might be suffered—approval of resource extraction that would damage the wilderness, recreational, and subsistence values of ANWR—the injury immediately at issue here is injury to informational values and participatory rights. Thus, in contrast to *Chamber of Commerce, see* 439 F.Supp. at 768, the exercise by Congress of its legislative powers will not nullify any declaratory relief the Court might grant. The relief requested would enable effective public participation in the process leading to legislation and would promote the use of full and accurate information in that debate.[16]

■ The allegations of the complaints, in light of the case law and the values underlying NEPA, secure plaintiffs' standing under NEPA to challenge the LEIS at issue

---

15. It is also significant that the legislation at issue in *Wingfield* had previously passed both houses of Congress and had been vetoed by the President; at the point Wingfield brought suit, the legislation had been reintroduced by a new session of Congress and was pending.

16. Finally, defendants' argument that plaintiffs' recourse is to lobby Congress is not relevant. The point is that under NEPA, plaintiffs have the right to information and participation at the agency level as well as the Congressional level.

here. As expressed by the Supreme Court, an EIS serves two interrelated purposes:

It ensures that the agency, in reaching its decision [whether to go forward with the project], will have available and will carefully consider detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision.... It gives the public the assurance that the agency 'has indeed considered environmental concerns in its decisionmaking process'.... and, perhaps more significantly, provides a springboard for public comment.

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349, 109 S.Ct. 1835, 1845, 104 L.Ed.2d 351 (1989) (citations omitted). Our Circuit emphasized similar values with regard to legislative EISs in particular. "[W]e do not believe," the court wrote, that a final LEIS "should be viewed simply as a legislative aid.... Section 102(2)(C) of NEPA establishes the environmental impact statement requirement for proposals for legislation in part to ensure that the *public* has an opportunity to participate meaningfully in decisionmaking at the administrative *and legislative levels.*" *Izaak Walton League*, 655 F.2d at 365 (emphasis supplied). To hold that plaintiffs lack standing and thereby immunize the LEIS from challenge would completely undermine these essential purposes of NEPA. Accordingly, the Court finds (as did the court in *Atchison*) that "the requirement of an adequate EIS for legislative proposals can be enforced by a private right of action." 431 F.Supp. at 728. Defendants' motion to dismiss plaintiffs' NEPA claims for lack of standing must therefore be denied.

## C. Conflict between ANILCA and NEPA

A further argument defendants advance for dismissal is that insofar as ANILCA and NEPA are inconsistent, the former overrides or repeals the latter, precluding revision or supplementation of the LEIS. Specifically, defendants assert that the deadlines imposed by Congress on the preparation and submission of the § 1002 Report (five years and nine months) require that NEPA not be applied to ANILCA. *See Flint Ridge Development Co. v. Scenic Rivers Association*, 426 U.S. 776, 96 S.Ct. 2430, 49 L.Ed.2d 205 (1976).

In *Flint Ridge*, the Supreme Court held that where Congress had required that certain land sales reports be effective thirty days after they were filed, there was a "fundamental conflict of statutory duty" that was "irreconcilable," 426 U.S. at 791, 96 S.Ct. at 2440, and therefore NEPA could not apply. There, an environmental group had requested that an EIS be prepared on the reports; no such EIS was undertaken. The instant case is distinguishable. Most notably, it has already been held that the § 1002 Report is subject to NEPA, *Trustees for Alaska, supra*, and, therefore, to that extent, no conflict between NEPA and ANILCA can be said to exist. Furthermore, the deadlines here are not nearly as restrictive as those in *Flint Ridge* (and, in any event, have already passed).

Defendants' contention also collapses under the weight of authority on statutory conflicts. There is no question that ANILCA does not by its terms repeal NEPA. And it is indisputable that repeal by implication is disfavored. *See, e.g., Tennessee Valley Authority v. Hill*, 437 U.S. 153, 189, 98 S.Ct. 2279, 2299, 57 L.Ed.2d 117 (1978). "In the absence of some affirmative showing of an intention to repeal, the only permissible justification for finding repeal by implication is when the earlier and later statutes are irreconcilable." *Izaak Walton League*, 655 F.2d at 366. In the context of NEPA, which requires government agencies to comply with its strictures "to the fullest extent possible," 42 U.S.C. § 4332(2)(C), courts have been especially reluctant to hold that another statute overrules it. As the D.C. Circuit has observed,

Given Congress' clearly expressed desire to ensure that all government actions are taken in accordance with NEPA, and its ability to expressly override the requirements of the Act, we believe that, even

when substantive legislation is involved, repeal by implication should be found only in the rarest of circumstances. Absent very strong evidence in the legislative history demonstrating a congressional desire to repeal NEPA, or a direct contradiction between that Act and the new legislation, claims under NEPA should be reviewed.

*Id.* at 367 (citing cases). Presented with a somewhat similar situation, the Ninth Circuit found that a statutory time constraint did not act as an implied waiver of NEPA requirements. In *Forelaws on Board v. Johnson,* 743 F.2d 677 (9th Cir.1984), *cert. denied,* 478 U.S. 1004, 106 S.Ct. 3293, 92 L.Ed.2d 709 (1986), the court determined that where Congress gave a regional power authority nine months to offer contracts for power delivery (and one year for customers to accept) it did not implicitly repeal NEPA or otherwise imply an exemption therefrom. Accordingly, the court found that the regional power authority was required to prepare an EIS. In analogous circumstances, our circuit has rejected the argument that an agency rule should not be subject to notice and comment rulemaking under the APA because it would delay implementation of the governing statute. "An agency's functions will be impaired any time it is reversed on procedural grounds, and such occasional impairments are the price we pay to preserve the integrity of the APA.... [A] court serves neither the law nor, ultimately, the parties before it by succumbing without a cautious examination of a case's facts, to whatever *fait accompli* an agency may choose to present." *New Jersey v. EPA,* 626 F.2d 1038, 1048 (D.C.Cir.1980).

Finally, ANILCA contains a "clear statutory emphasis on environmental concerns," and thus an exemption from NEPA would be inconsistent with the environmental objectives of the Act itself. *See Forelaws,* 743 F.2d at 683. Indeed, § 1002 expressly directs the study of such issues. Thus the complaints here cannot be dismissed on the grounds that ANILCA conflicts with NEPA.

## D. Judicial Review, Standing, and the § 1002 Report

In addition to challenging the adequacy of the LEIS, plaintiffs assert that the § 1002 Report violates ANILCA § 1002(h). Defendants argue that Congress did not create a private right of action to enforce compliance with the statute, that judicial review of the Report is unavailable, and that plaintiffs are not within the zone of interests meant to be protected by § 1002 and therefore lack standing. It is clear that there is no private right of action under that provision but, as defendant-intervenors note, that alone does not doom plaintiffs' claim, as they might be able to pursue it under the APA. The APA provides judicial review of agency action when a person is adversely affected or aggrieved by that action. 5 U.S.C. § 702. Such review is precluded only when the statute itself prohibits review, *id.* § 701(a)(1), or when the action is committed by law to agency discretion, *id.* § 701(a)(2).

Defendants argue, based on a ruling in this Circuit's *Natural Resources Defense Council, Inc. v. Hodel,* 865 F.2d 288 (D.C.Cir.1988) ("*NRDC*"), that the § 1002 Report is not "agency action" within the meaning of the APA and hence not subject to judicial review. *NRDC* concerned, *inter alia,* a section of an appropriations act ("§ 111") directing the Secretary to submit to Congress his response to certain designated proposals for outer continental shelf ("OCS") leasing. Specifically, Congress mandated that the Secretary "indicate in detail why any specific portion of the proposals ... was not accepted" and include the explanation in his final OCS program proposal to Congress. *See* 865 F.2d at 316 & n. 27. Petitioners there claimed that the Secretary's program violated § 111 because he did not adequately explain his rejection of three proposals. The court of appeals concluded that § 111, "in essence, a reporting provision," was not susceptible of judicial review. *Id.* at 317. Defendants argue that ANILCA § 1002 is, similarly, a reporting provision, for which review is unavailable. The Court agrees.

The court of appeals in *NRDC* found that the APA judicial review provision and the general presumption in favor of judicial review of administrative action were not applicable for two reasons. First, the nature of the agency action differed from "the prototypical exercise of agency power" where the agency "has exercised authority delegated (at least arguably) to it by Congress," and is thus "exercising legislative functions" or "adjudicatory functions that have been specifically ordained by Congress." *Id.* at 318. In submitting the § 111 report, in contrast, the Secretary was "simply reporting back to the source of its delegated power in accordance with the Article I branch's instructions." *Id.* The function of judicial review of agency action—to check agency exercise of delegated power—has no place where a report is simply a "management tool employed by Congress for its own purposes." *Id.* at 319. Second, § 111 provided no basis for "formulating judicially manageable standards by which to gauge the fidelity of the Secretary's response to the strictures of § 111." *Id. See also Taylor Bay Protective Association v. Administrator, U.S. Environmental Protection Agency,* 884 F.2d 1073 (8th Cir.1989) (following *NRDC* in finding unreviewable compliance with a statute requiring the Army Corps of Engineers to report to Congress on the operation of its projects); *accord Greenpeace USA v. Stone,* 748 F.Supp. 749 (D.Haw.1990) (claim that Army violated reporting provision in Defense Department appropriation statute not reviewable).

Plaintiffs set forth a number of factors they contend distinguish the § 1002 Report from the reporting statutes considered in *NRDC* and *Taylor Bay.*[17] They claim that, unlike the provisions at issue in those cases, the § 1002 Report was meant not only to inform Congress but also to inform the public generally. *Cf.* 865 F.2d at 317 n. 30 ("a reporting-to-Congress obligation is entirely different than a congressionally imposed requirement that an Executive Branch department or agency gather information and make that information, upon compilation, publicly available."). However, they provide no support for that proposition, aside from analogizing the Report to an EIS. As defendant-intervenors correctly point out, the Report was not explicitly or implicitly intended as anything more than a vehicle to inform Congress. The subsection of the statute is labeled "Report to Congress." 16 U.S.C. § 3142(h). It is for Congress, not the courts, to determine if the Report satisfies the statutory requirements it enacted.

Plaintiffs further claim that the statute here *does* have standards by which to judge the Secretary's compliance, namely the six subparagraphs of § 1002(h) outlining the content Congress wanted in the Report (quoted *supra*). As an initial matter, it is not clear that the six subparagraphs do indeed contain enforceable standards; they merely set forth topics that Congress wanted studied, and contain fairly general language such as "identification," "description," "evaluation," and "recommendation." The Court has no means of ascertaining, for example, what level of detail Congress demanded of the Secretary.[18] In any event, even were the Court to conclude that the statute's requirements were sufficiently discernible to judge the Report, that would not be dispositive because *NRDC* did not rely on the absence of such standards to find the statute unreviewable. The existence of that checklist does not lessen the impropriety of the Court making "a judgment peculiarly for Congress;" it would be constitutionally questionable for the Court (and plaintiffs) "to act as an ersatz proxy

---

**17.** The *NRDC* court expressly noted that it did not decide the "broad, theoretical question whether an interbranch reporting requirement can ever be reviewable in the absence of an express provision for judicial review." 865 F.2d at 318 n. 33. Similarly, in this case it is concluded that under the specific circumstances of the reporting section at issue, review is not available.

**18.** Plaintiffs observe that the NEPA statute itself is less specific than § 1002(h) and yet it is reviewable. That argument is disingenuous, because compliance with NEPA is judged by the standards set forth in its detailed implementing regulations. No such regulations exist here.

for Congress itself." *NRDC*, 865 F.2d at 318.

As to the similarities between § 1002(h) and the requirements for environmental impact statements, simply because the latter are reviewable does not make the former reviewable. Moreover, to the extent that plaintiffs are within the "zone of interests" protected by § 1002, they can vindicate those interests through their challenge to the LEIS that was conducted on the § 1002 Report.

In the absence of a provision for judicial review, and with only vague guidelines as to how to evaluate compliance with the provisions, whether the § 1002 Report prepared by the Secretary complied with the requirements of § 1002(h) is not subject to judicial review. Accordingly, plaintiffs cannot challenge that aspect of the Report and the claims premised on that provision of ANILCA must be dismissed.[19]

### E. ANILCA Section 810 Claim

■ The complaints further allege that the LEIS violates ANILCA § 810, 16 U.S.C. § 3120.[20] Section 810 governs subsistence and land use decisions for all lands covered by ANILCA. Subsection (a) provides, in relevant part, that "[i]n determining whether to withdraw, reserve, lease, or otherwise permit the use, occupancy, or disposition of public lands under any provision of law authorizing such actions, the head of the Federal agency having primary jurisdiction over such lands or his designee shall evaluate the effect of such use, occupancy, or disposition" on subsistence uses. 16 U.S.C. § 3120(a). It further requires that "[n]o such withdrawal, reservation, lease, permit, or other use, occupancy or disposition of such lands which would significantly restrict subsistence uses shall be effected until the head of such Federal agency" fulfills specified notice require-

ments and makes certain determinations. *Id.* Plaintiffs claim the LEIS violates subsection (b), which states in full: "If the Secretary is required to prepare an environmental impact statement pursuant to [NEPA], he shall provide the notice and hearing and include the findings required by subsection (a) of this section as part of such environmental impact statement." *Id.* § 3120(b). The Secretary did not include § 810(a) findings in the *ANWR Report.*

Defendants argue that this claim should be dismissed because it is premature. They contend that § 810(b) only applies when one of the actions specified in § 810(a) is authorized; the § 1002 Report is not one of those actions, and hence the evaluations mandated by § 810 are not necessary. Notwithstanding plaintiffs' emphasis on the statute's opening words "[i]n determining whether," [21] defendants are correct. The provision unambiguously refers to the withdrawal, lease, or other use of the subject public lands "under any provision of law authorizing such actions." *Id.* § 3120(a). The actions plaintiffs are concerned about have not been authorized by law; indeed, such actions are expressly prohibited unless and until Congressional authorization has been given. ANILCA § 1003, 16 U.S.C. § 3143. Nor has the Secretary determined to take any such actions, as he is not authorized to do so.

Furthermore, as defendant-intervenors point out, plaintiffs' construction of the statute would render meaningless ANILCA § 1002(c)(E), which requires the Secretary, as part of the Baseline Study, to "analyze the potential effects of [oil and gas exploration, development, and production] on the culture and lifestyle (*including subsistence*) of affected Native and other people." 16 U.S.C. § 3142(c)(E) (emphasis added). As noted earlier, the Baseline Study was not challenged.

---

**19.** As a practical matter, given that the § 1002 Report and LEIS are one and the same document, this ruling does not vitiate plaintiffs' challenge to the Report. It does mean that the only standards under which it can be reviewed are those set forth in NEPA and its implementing regulations.

**20.** *See* Complaint No. 89–2345, Count III; Complaint No. 89–2393, Count II.

**21.** *See* Plaintiff Gwich'in Steering Committee, Inc.'s Response in Opposition to Defendants' Motion to Dismiss at 4–5.

If and when Congress enacts legislation authorizing the withdrawal, lease, or other disposition of the public lands covered by ANILCA, and the Secretary then fails to comply with § 810, at that point plaintiffs may be able to bring a claim under that statute. At present, however, plaintiffs' claim involves "contingent future events that may not occur as anticipated, or indeed may not occur at all," and thus are not sufficiently ripe to establish a concrete case or controversy. *See Thomas v. Union Carbide Agricultural Products Co.,* 473 U.S. 568, 580–81, 105 S.Ct. 3325, 3333, 87 L.Ed.2d 409 (1985). Plaintiffs' § 810 claim must be dismissed as premature.

### III. MOTION FOR PRELIMINARY INJUNCTION

As mentioned *supra,* plaintiffs charge that the recent issuance of the *1991 Overview* has deprived them of their rights under NEPA to notice and comment of what they claim is "legally a supplemental EIS." They assert it contains information that significantly changes the § 1002 Report and LEIS and is relevant to impacts on the environment because it incorporates significant new data, assumptions, and analyses, which lead to a wholly new estimate of the likelihood of finding recoverable quantities of oil on the coastal plain. Further, plaintiffs contend, there is no means to evaluate the data and conclusions contained in the *1991 Overview* because it lists no references, identifies no studies, and otherwise does not explain the bases for the conclusions reached. For relief, plaintiffs ask for (1) an injunction requiring the Secretary to issue the document as a draft supplemental LEIS for public comment; and (2) an injunction mandating the release of all non-confidential data and studies used in generating the document.

Defendants respond by reiterating the arguments presented in their motions to dismiss [22] and by claiming that, in any event, the new information neither substantially amends the § 1002 Report/LEIS nor

constitutes "significant" new information as required by the NEPA regulations for supplementation. Finally, defendants aver that the request for release of data is not properly before the court because plaintiffs have already received some of that data through a FOIA request, and they have appealed the denial of release of certain other data to the Department.

▆▆ There are four prerequisites that must be met before a court may grant preliminary injunctive relief. Plaintiffs must show (1) likelihood of success on the merits; (2) that irreparable injury will result if the injunction is not granted; (3) that there will be no substantial adverse impact on other parties; and (4) that the injunction would serve the public interest. *Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc.,* 559 F.2d 841, 842–43 (D.C.Cir.1977); *Virginia Petroleum Jobbers Association v. FPC,* 259 F.2d 921, 925 (D.C.Cir.1958). This test is not a wooden one, for as our court of appeals has noted, relief may be granted "with either a high probability of success and some injury, or *vice versa.*" *Cuomo v. United States Nuclear Regulatory Commission,* 772 F.2d 972, 974 (D.C.Cir.1985) (per curiam); *see also Holiday Tours,* 559 F.2d at 843.

### A. *1991 Overview*

1. **Likelihood of Success on the Merits.** To show a likelihood of success on the merits, plaintiffs must demonstrate that they are likely to succeed on their claim that the *1991 Overview* is or should be a supplemental environmental impact statement ("SEIS") within the meaning of NEPA.

To even reach that question, however, requires the threshold determination that the LEIS here is subject to the requirement that EISs be supplemented. Defendant-intervenors forcefully argue that the NEPA regulations do not contemplate supplementation in this context. Indeed, a superficial reading of the regulations strong-

---

**22.** To the extent that defendants' arguments echo those made in their motion to dismiss, they will not be considered further here.

ly suggests as much: "Except for proposals for legislation as provided in § 1506.8 environmental impact statements shall be prepared in two stages and may be supplemented." 40 C.F.R. § 1502.9. This section, however, must be read in conjunction with the section governing proposals for legislation. As already observed, this latter section exempts an LEIS from having to be prepared into two stages, but excepts from that exemption an LEIS resulting from a study process required by statute. *See id.* § 1506.8(b)(2)(ii). It has been finally and conclusively determined, as noted *supra*, that the § 1002 Report falls within this exception to the exemption. Defendant-intervenors nonetheless insist that the conclusion that the LEIS on the § 1002 Report was required to be prepared in two stages does not mean that it must also be supplemented. They point to the Council on Environmental Quality ("CEQ")[23] comments on § 1506.8, where the special rules for LEISs are explained:

> Unlike administrative proposals, the timing of critical steps (hearing, votes) is not under the control of the administrative agency.... Congress may request Federal agencies to provide any additional environmental information it needs following receipt of a legislative EIS.... and the final product, if any, may be substantially different from the proposal transmitted by the Federal agency. Congress may hold hearings on legislative proposals and invite testimony on all aspects of proposed legislation including its environmental impacts.

43 Fed.Reg. 55,978, 55,988 (1978). These considerations are not dispositive. CEQ's comments on this section earlier explain that the truncated EIS process for legislative proposals applies "[e]xcept in prescribed circumstances." *Id.* at 55,987. The LEIS at issue here is within one of those prescribed circumstances and thus

the comments excerpted above have little bearing here.

Furthermore, the policies of NEPA, and the conclusion that the adequacy of an LEIS can be challenged, supports this reading of the regulations, especially in this context. An agency's duty under NEPA is a continuing one. Indeed, the Supreme Court has explained that this duty continues even after a project requiring an EIS is approved. "It would be incongruous with this approach to environmental protection, and with the Act's manifest concern with preventing uninformed action, for the blinders to adverse effects, once unequivocally removed, to be restored prior to the completion of agency action simply because the relevant proposal has received initial approval." *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 371, 109 S.Ct. 1851, 1858, 104 L.Ed.2d 377 (1989) (citation omitted). So long as the decision-making process is still pending, *see id.* at 374, 109 S.Ct. at 1859, the "broad dissemination of relevant environmental information"[24] will be promoted by supplementation, if and when appropriate.[25]

Having determined that the LEIS at issue here is subject to supplementation, the applicable regulations must be examined. The regulations require that supplements to either draft or final environmental impact statements "shall" be prepared if "(i) The agency makes substantial changes in the proposed action that are relevant to environmental concerns; or (ii) There are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1)(i), (ii). Here, plaintiffs allege that the *1991 Overview* presents "significant new information relevant to environmental concerns."

The regulations define "significantly" as including "considerations of both context and intensity." *Id.* § 1508.27. Context "means that the significance of an action

---

**23.** CEQ regulations implement the procedural provisions of NEPA. *See* Exec.Order No. 11,-991, 3 C.F.R. § 123 (1977 Comp.).

**24.** *Methow Valley*, 490 U.S. at 350, 109 S.Ct. at 1846.

**25.** Interestingly, defendants Secretary of the Interior and the Department of the Interior did not, either in their pleadings or at the hearing, press the argument that the *ANWR Report* is not subject to these NEPA regulations.

must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality." *Id.* § 1508.27(a). Intensity refers to the severity of the impact. The regulations require that the following factors, *inter alia*, be considered in evaluating intensity:

(1) Impacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial....

(3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.

(4) The degree to which the effects on the quality of the human environment are likely to be highly controversial....

(9) The degree to which the action may adversely affect an endangered or threatened species or habitat.

*Id.* § 1508.27(b). Plaintiffs must demonstrate, on a reviewable environmental record, that the new information raises a substantial environmental issue. *Sierra Club v. Froehlke*, 816 F.2d 205, 210 (5th Cir.1987). Then, they must show that defendants acted arbitrarily and capriciously in not issuing an SEIS. *Oregon Natural Resources Council*, 490 U.S. at 376, 109 S.Ct. at 1860 (standard of review of decision not to supplement an EIS is the deferential standard of APA § 706(2)(A)).

To appreciate the significance of the relevant information in *1991 Overview* requires a brief summary of the related passages in the § 1002 Report and LEIS, the *ANWR Report*. The *ANWR Report* concluded that there was a 95% chance of finding more than 0.6 billion barrels of oil ("BBO") and a 5% chance of finding more than 9.2 BBO in the coastal plain. *ANWR Report*

at 56. It determined that the conditional mean estimate of economically recoverable oil [26] in this area was 3.2 BBO. The Report concluded that, overall, there was a 19% marginal probability [27] of finding recoverable oil there. *Id.* at 76, 79–80. The *1991 Overview* changed these assessments. As the Summary of Findings explains,

This study reaffirms most of the conclusions and estimates made in the 1002 Report, and increases the level of confidence that ANWR is part of the North Slope oil province. This is demonstrated by the increase in the marginal probability of economic success from 19 percent in the original assessment to 46 percent in the current assessment.... The overall Minimum Economic Field Size (MEFS) for the 1002 area has been lowered from about 0.44 [BBO] to about 0.40 BBO. The mean resource estimate has increased from 3.23 to 3.57 BBO.

*1991 Overview* at 1.[28]

Defendants argue that the *1991 Overview* does not qualify as a supplemental EIS because the information set out above is not "significant" within the meaning of 40 C.F.R. § 1502.9(c)(1)(ii), for two reasons: first, it is not environmental information and, second, in any event, it was determined that there would be no change in assessed impacts on the environment. In particular, defendants point out that the analysis of impacts in the *ANWR Report* assumed a 100 percent chance of finding oil. They also offer affidavits from officials at BLM stating that BLM had concluded that no further infrastructure than envisioned in the *ANWR* report would be necessary to exploit the greater amount of oil.

As to the first argument, it has been held that the "change need not be strictly environmental ... the test is whether the new

**26.** This estimate is the arithmetical average of the estimates made of the amount of economically recoverable oil, with the condition that oil is present in economic amounts. Hughes Affidavit ¶ 8 (attached to Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction).

**27.** This is the likelihood that an economical oil field exists and will be found, on the assump-

tion that a normal exploration program is pursued consisting of drilling several exploratory wells in the areas with highest potential oil prospects. Hughes Aff. ¶ 9.

**28.** The *1991 Overview* uses more precise figures than the *ANWR Report;* thus, the 3.2 BBO mean cited in the latter is apparently 3.23 BBO.

information so alters the project's character that a new 'hard-look' at the *environmental consequences* is necessary." *Froehlke*, 816 F.2d at 210 (emphasis original) (citing *Wisconsin v. Weinberger*, 745 F.2d 412, 418 (7th Cir.1984)). Of course, "the new circumstance must present a *seriously* different picture of the environmental impact of the proposed project from what was previously envisioned." *Id.* (emphasis original). Furthermore, information "that does not seriously change the environmental picture, but that nevertheless affects, or could affect, the decisionmaking process, is subject to the procedural requirements of NEPA." *Id.* at 212.

It is difficult to agree with defendants, even on the spare record before the Court, that the *1991 Overview* does not present "significant new information." First of all, although the agency's characterization is not dispositive, the agency itself obviously considered this new information highly important, as is evident from the fact that it issued the report publicly and made much of its findings in testimony to Congress and elsewhere. It is also obvious from the language of the *1991 Overview* itself. The first sentence announces that it "makes a considerable contribution to the knowledge and understanding of the petroleum geology of the 1002 area." The following paragraph proclaims that it "reflects new and reinterpreted geological data, state-of-the-art engineering, current tax provisions, and updated economic data." *1991 Overview* at 1.[29] Secretary Lujan gave the report great weight, highlighting it in recent testimony to Congress. He stated that his department had "recently released a reevaluation of the possible oil resources of the coastal plain, based on newly available information," which supported the *ANWR Report*'s recommendation of full leasing in the coastal plain. Testimony of the Honorable Manual Lujan, Jr., to Senate Joint Subcommittee Hearing on the Interior Department's Recommendation to Develop the Arctic National Wildlife Refuge's Coastal Plain (May 10, 1991), Attachment E to Plaintiffs' Motion for Preliminary Injunction. Furthermore, the predominance of the oil and gas assessment (and its implications) in the *ANWR Report*—it comprises three full chapters (out of eight)—belies any assertion that the "updating" thereof is insignificant with regard to the LEIS.[30]

Second, common sense must reject defendants' argument that a change amounting to 340,000,000 barrels of oil will be environmentally insignificant. Plaintiffs' counsel pointed out at the hearing (without contradiction from defendants) that the increased amount entails, for example, 400 more oil tanker trips than initially envisioned. A more-than-doubling of the probability of finding oil also substantially (even if not to the same extent) increases the probability that environmental harms will occur, such as accidents related to the exploitation and transportation of the resources. *E.g.* *ANWR Report* at 115; *cf.* Complaint No. 89–2345 ¶ 35. This enhanced quantity assessment must also lengthen the time that will be allotted to exploration and, possibly, exploitation. Furthermore, it is logical to expect that the decrease in the minimum economic field size would encourage more extensive exploration which, in turn, would increase the probability of environmental impacts.

Testimony to Congress based on the *1991 Overview* reveals another important change presented by these revised estimates. Defendant Secretary of the Interior Lujan told a joint Senate subcommittee:

Proximity to the Trans–Alaska Pipeline System (TAPS) provides a ready means to bring 1002 area oil to market. Moreover, it will prolong the useful life of TAPS which, in turn, will enable an estimated additional 1 [BBO] to be recovered

---

**29.** *See also id.* at 2 ("The new data provide a higher degree of confidence in determining the nature of geological plays described in the original 1002 Report. This is important to the definition of drilling objectives in the mapped prospects.").

**30.** The importance of these assessments in the original Report is noted therein. *See, e.g., ANWR Report* at 83 ("Determining the possible magnitude of [oil and gas] development in the 1002 area required an estimate of the amount of potentially recoverable hydrocarbon resources.").

from five discovered but undeveloped North Slope Fields.

North Slope oil production has been declining since 1989 ... it will fall to 300,000 barrels per day [by] 2009, with some 1 [BBO] remaining to be produced. Three hundred thousand barrels per day is the minimum amount of oil TAPS needs for technical and economic operation. Thus, unless TAPS through-put is augmented by 1002 area production, it will shut down....

Lujan Testimony, *supra*.[31] Prolonging the useful life of the Trans–Alaska Pipeline System will, at the least, prolong the duration of environmental impacts posed by that particular structure, and is an "impact on the region" that should be considered. *See* 40 C.F.R. § 1508.27(a).

Even if each of these matters alone would not be "significant" (and there are likely to be even more than mentioned here), when considered together they are "significant" within the meaning of the NEPA regulations. In addition, these changes as a whole—the sizeable jump in the probability of finding more economically recoverable oil—will drastically affect the weight of the economic benefits in the decisionmaking process. *See Froehlke*, 816 F.2d at 212.

Defendants do not mention these potential impacts. Instead, they focus on the determination by the Fish and Wildlife Service ("FWS"), the lead agency on this project,[32] that BLM was correct in concluding that the new information would not require changes to the predicted development infrastructure on which FWS had based its assessment of environmental impacts in the *ANWR Report*. *See* Affidavit of James M. Hughes, Assistant to the Secretary and Director, Office of Congressional and Legislative Affairs, Department of the Interior, ¶ 20 & Attachments 4, 5; Affidavit of Walter O. Stieglitz, Regional Director of the U.S. Fish & Wildlife Service,

¶¶ 4, 6. Indeed, the *ANWR Report* states that "[t]he magnitude and types of effects resulting from development should be essentially the same for all development scenarios," and specifically notes that "additional production from the 5–percent case [9.2 BBO] is not likely to significantly change the impacts of a main oil pipeline, haul road, airstrips, ports and supporting roads and infrastructure from that required to develop the 3.2 [BBO] case." *ANWR Report* at 105. It is not disputed by plaintiffs that the infrastructure would not need to be changed. Plaintiffs' thrust, however, is that there are other significant impacts; indeed, the *ANWR Report* identifies impacts other than infrastructure related to resource assessments that the above affidavits and attachments simply fail to address. *E.g., id.* at 105 (additional disturbance of wildlife if development activities "more intense"); 111 (obtaining water for drilling and ancillary needs "has the potential for major adverse effects"). The *ANWR Report* does comment that the environmental effects associated with the development of a larger volume of oil "would not increase proportionately with increased production." *Id.* at 105. That conclusion hardly means that the increased effects would not be significant. Finally, the government's affidavits do not state that it is only the infrastructure that would not experience significant impacts based on the increased resource recovery estimates.

 More importantly, however, defendants' reliance on these unstated determinations raises a critical issue: the *1991 Overview* does not itself conclude that environmental impacts will not be increased—*it does not mention them at all,* and it must, therefore, be presumed that the agency did not even consider potential impacts, whether significant or not. When an agency issues new information relating to an already issued EIS, it is free not to issue a

---

**31.** The Secretary of the Department of Energy testified to the Senate Committee on Energy and Natural Resources (before the document had been publicly released but after he was alerted to its contents) that there is a direct relationship between future ANWR production and TAPS,

and that the revised (3.6 BBO) mean estimate of recoverable resources would extend the life of the pipeline by 9 years. Hearing, Mar. 12, 1991 (attached to Motion for Preliminary Injunction).

**32.** *See supra* note 3.

supplemental EIS if it can show that it "carefully scrutinized the proffered information." *Oregon Natural Resources Council,* 490 U.S. at 383, 109 S.Ct. at 1864.[33] It is significant, in this context, that plaintiffs here, as well as others, did offer information on these very subjects. *See, e.g.,* Complaint No. 89–2345 ¶¶ 18–23. Defendants did not respond to the information, much less explain why they disregarded the proffered data. Their failure to do so ignores the central role assigned by NEPA to public participation. "We recognize and assign great importance to NEPA's review and comment procedures for obtaining and incorporating opposing viewpoints into the final EIS, and thus into the heart of the decision process." *Froehlke,* 816 F.2d at 212.[34]

A court's role in reviewing a decision not to supplement an EIS involves "carefully reviewing the record and satisfying [itself] that the agency has made a reasoned decision based on its evaluation of the significance—or lack of significance—of the new information." *Id.* 109 S.Ct. at 1861. Under the "arbitrary and capricious" standard of the APA, this means the court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). Here, there is no public disclosure of any consideration of elements beyond the oil recovery estimates and related matters. Affidavits such as those presented here are no substitute for an explanation in the *1991 Over-*

*view* itself that environmental impacts were considered and determined to be significant or not. *Cf. Grazing Fields Farm v. Goldschmidt,* 626 F.2d 1068, 1072 (1st Cir.1980) (environmental study found only in the administrative record fails to satisfy NEPA's circulation requirements). "[R]egardless of its eventual assessment of the significance of this information, the [defendants] had a duty to take a hard look at the proffered evidence." *Oregon Natural Resources Council,* 490 U.S. at 385, 109 S.Ct. at 1865.[35]

■ An agency "need not supplement an EIS every time new information comes to light." *Id.* at 373, 109 S.Ct. at 1859. However, "[i]f there remains major federal action to occur, and if the new information is sufficient to show that the remaining action will affect the quality of the human environment in a significant manner or to a significant extent not already considered, a supplemental EIS must be prepared." *Id.* at 374, 109 S.Ct. at 1859. There is no "informed discretion" or "technical expertise" of defendants here to which the Court could defer, even if the information were deemed insignificant. *Cf. id.* at 377, 109 S.Ct. at 1861. Significant new information has been indicated here, and in any event no explanation provided of why it would not be significant under NEPA. Defendants' failure to consider these matters and to issue an SEIS with this new information was arbitrary and capricious. Plaintiffs have shown a very strong likelihood of prevailing on the merits.

---

**33.** *See also Methow Valley,* 490 U.S. at 350, 109 S.Ct. at 1846 ("*If* the adverse environmental effects of the proposed actions are *adequately identified and evaluated,* the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs.") (emphasis supplied).

**34.** *See* 40 C.F.R. § 1502.1 (an EIS "shall provide *full and fair* discussion of significant environmental impacts") (emphasis supplied).

**35.** In this regard, it is interesting that the *1991 Overview* was not based solely on internal studies by the Department (or BLM). The Overview states, for example, that "BLM also obtained approximately 800 line miles of the original seismic data that was *reprocessed by indus-*

*try.... * [A Department of Energy draft study] was combined with an in-house analysis *and a survey of major companies* operating on the North Slope...." *1991 Overview* at 1–2 (emphases supplied). When questioned at the hearing whether defendants had solicited information from industry, government counsel only answered indirectly that "there have been contacts between the agency and industry." No contacts were made with any other interested parties, however. It cannot be that the *only* relevant information on this matter comes from industry, especially where this is a question of great public controversy and where there are identified organizations that have been actively engaged in the debate over ANWR.

**2. Remaining Factors in the Balance.** As for irreparable injury, the discussion on injury-in-fact, *supra,* covers this factor; NEPA presumes injury where participation in the NEPA process is denied.[36]

The harm to third parties is negligible. Defendants, again invoking the separation of powers doctrine, claim that they will be injured in their communication with Congress and the resultant delay. Plaintiffs are not asking for interference with that communication, however. They are asking that this document—its contents—be released for public comment in accordance with NEPA regulations. Nor are they asking the withdrawal of the *1991 Report* from Congress' hands.[37] No impingement on the communication between the two representative branches is intended or necessary. This is an instance where "the CEQ regulations require public comment at the administrative level" and therefore the relief sought entails "simply enforcing Congress's mandate under NEPA and does not violate the separation of powers doctrine." *Trustees for Alaska,* 806 F.2d at 1383 n. 8.[38]

Defendant-intervenors, in a related argument, invoke the specter of intrusive, continuing court supervision of the *ANWR Report.* This intrusion can hardly be of concern, however, where the agency itself has presented the new information as an update of an existing LEIS. More to the point, the CEQ regulations preclude any such continuing supervision, as supplements are necessary only when significant new information is presented.

Delay here is not a substantial question because the parties know well how to expedite these matters to meet the pressing moment.[39] Further, defendants themselves plan to continue updating this and other information in the LEIS, according to the Department's Assistant Secretary for Land and Minerals Management.[40] It is obvious that defendants consider the matter ongoing, and there is no reason that the circulation of this data could not be incorporated into their timetable.

Finally, the public interest weighs in favor of release of the *1991 Overview,* or its information, as a supplemental EIS for public review and comment. For "the broad dissemination of information mandated by NEPA permits the public and other government agencies to react to the effects of a proposed action at a meaningful time." *Oregon Natural Resources Council,* 490 U.S. at 371, 109 S.Ct. at 1858.

**3. Form of Relief.** Were this a prohibitory injunction, the balance of the equities would tilt markedly in plaintiffs' favor, primarily with the weight of the likelihood of their success on the merits. But the relief requested as a preliminary injunction ordering defendants to release the *1991 Overview* as a draft SEIS will not be granted in that form. "An action purportedly requesting a mandatory injunction against a federal official is analyzed as one requesting mandamus." *National Wildlife Federation v. United States,* 626 F.2d 917, 918 n. 1 (1980) (citing cases). The mandamus remedy is even more extraordinary than injunctive relief, and such drastic action is unnecessary.

---

**36.** *Cf. Community Nutrition Institute v. Butz,* 420 F.Supp. 751, 757 (D.D.C.1976) ("the harm suffered by those who would otherwise participate in agency rulemaking under the APA is irreparable when the agency fails to afford them their rights to such participation").

**37.** Defendants are not faulted for providing the information to Congress; rather, they erred in failing to circulate and analyze the information as required under NEPA.

**38.** Defendants also insist that releasing the *1991 Overview* as an SEIS would be "wasted effort" because the final decision is with Congress, and Congress may act at any time, with or without the information. The risk of Congress mooting

the agency's efforts is not entirely relevant. Virtually any lawsuit may be mooted by the subsequent actions of a third party.

**39.** For example, the Ninth Circuit decided *Trustees for Alaska* in late December 1986, and the entire environmental impact statement process was completed by May 1987—five months later.

**40.** *E.g.,* "the BLM is continuing to reassess its earlier estimates of the economics of developing these resources. We expect this reassessment to be complete and available this summer." Testimony of Assistant Secretary David C. O'Neal to the House Merchant Marine Subcommittee on Fisheries and Wildlife Conservation and the Environment, May 1, 1991.

Rather, recognizing that in their complaints plaintiffs so request, the Court will enter a declaratory judgment that insofar as the *1991 Overview* is concerned, defendants violated NEPA by not circulating it as an SEIS and must do so, on an expedited basis.

### B. Request for Release of Data

Plaintiffs ask for the compelled release of nonconfidential data and attendant Department of Interior analyses on which the *1991 Overview* was based. This request will be denied and this portion of their claim dismissed.

Plaintiffs filed a FOIA request for this information on February 19, 1991. Motion for Preliminary Injunction, Attachment ("Attach.") B. The agency granted this request in part and denied the balance on March 20, 1991, Attach. C, with the Department providing all responsive documents it deemed nonconfidential. Plaintiffs have appealed the partial denial to the Department's FOIA Appeals Officer. Attach. D. The statutory deadline for issuing a decision on the appeal has passed, but the appeal is still pending. While plaintiffs would therefore be immediately entitled to seek review of the partial denial in district court, plaintiffs have not asked for such review. Instead, their counsel clearly exclaimed at the hearing that they were "content to wait until the FOIA appeal is exhausted." Accordingly, their claim is not ripe. When the decision on the appeal issues, the plaintiffs may, if then appropriate, commence a separate (albeit related) action in this Court.[41]

Similarly, defendant-intervenors ARCO Alaska *et al.* shall be dismissed because there is no possibility that their proprietary data will be implicated in this action at this time. Should the apparent need to protect their interests arise subsequently, they may move for intervention at that time.

41. Plaintiffs' concerns about the data and analyses relevant to the conclusions in the *1991 Overview* will be addressed by the defendants' compliance with the NEPA regulations, especially 40 C.F.R. § 1502.24 (agencies "shall identify any

### III. CONCLUSION

### A. Motion to Dismiss

In sum, because "NEPA clearly contemplates that the public should have an opportunity to challenge the adequacy of environmental impact statements," *Izaak Walton League*, 655 F.2d at 369, the Court concludes that plaintiffs have standing to challenge the adequacy under NEPA of the LEIS and the § 1002 Report, but that the compliance of the § 1002 Report with § 1002(h) is not reviewable and the claim under ANILCA § 810 is not ripe for review.

It is, therefore, hereby

ORDERED that defendants' motion to dismiss is granted in part and denied in part; it is

FURTHER ORDERED that Count II in complaint No. 89-2345 and Count I in complaint No. 89-2393 are dismissed; it is

FURTHER ORDERED that Count III in complaint No. 89-2345 and Count II in complaint No. 89-2393 are dismissed; it is

FURTHER ORDERED that as to the remaining counts of the consolidated complaints defendants' motion is denied.

### B. Motion for Preliminary Injunction

In consideration of the pleadings on the motion for preliminary injunction and the hearing held thereon, it is also

FURTHER ORDERED that plaintiffs' motion is denied. However, because they have prevailed on the merits of their claim concerning the *1991 Overview*, and because there is no just reason for delay of entry of judgment on this claim, *see* Fed.R.Civ.P. 54(b), it is hereby

DECLARED that defendants violated NEPA by not issuing the *1991 Overview* as an SEIS; and it is

FURTHER ORDERED that defendants comply with NEPA by issuing the *1991 Overview* for public circulation and com-

methodologies used and shall make explicit reference by footnote to the scientific and other sources relied upon for conclusions in the statement.").

ment as a draft SEIS on an expedited basis. For the reasons stated herein, no stay shall be granted should an appeal be taken. It is

FURTHER ORDERED that defendant-intervenors ARCO Alaska, Inc., Halliburton Geophysical Services, Inc., and Western Geophysical Company are hereby dismissed from this action.

A separate judgment accompanies this Memorandum Opinion.

## C. Remaining Matters

The merits of the remaining claims are not before the Court at this time; resolution thereof must await further briefing, which shall be accomplished according to the following schedule: Cross-motions for summary judgment shall be due no later than August 30, 1991; oppositions thereto, no later than September 23, 1991; replies, if any, no later than October 4, 1991.

IT IS SO ORDERED.